Oscar DANCY, Jr., Appellant,

v.

UNITED STATES of America, Appellee.

No. 20839.

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 8, 1968.

Decided May 10, 1968.

Mr. G. Bowdoin Craighill, Jr., Washington, D. C. (appointed by this court), for appellant.

Albert W. Overby, Jr., Asst. U. S. Atty., for appellee. Messrs. David G. Bress, U. S. Atty. and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief for appellee.

Before BAZELON, Chief Judge, and EDGERTON, Senior Circuit Judge, and MCGOWAN, Circuit Judge.

McGOWAN, Circuit Judge:

Appellant is before us after a second conviction of the federal narcotics offenses which were the subject of our reversal for a new trial in Dancy v. United States, 124 U.S.App.D.C. 58, 361 F.2d 75 (1966). The alleged sale of heroin giving rise to the indictment took place on December 7, 1962. This was long before this court decided Ross v. United States, 121 U.S.App.D.C. 233, 349 F.2d 210 (1965), and thereby brought into focus its growing concern about the substantial delays between offense and arrest in narcotics cases entailed by the police practice of using undercover officers to make narcotics purchases. Appellant now relies upon the doctrine of Ross as warranting his claim that, because of the shadows cast by the delay on his identification as the maker of the sale in question and on his ability to support an alibi defense, his conviction should be set aside and the indictment dismissed. Because we do not think that Ross compels such a result on this record, we affirm.

I

At the trial Officer Moore testified that, at 4 o'clock in the afternoon of December 7, 1962, and in company with one Harris, a police informant, he approached appellant on a public street. Harris asked appellant if he had any narcotics to sell and, upon receiving an affirmative answer, paid appellant $12 for one bag. The bag—a glassine envelope—was handed by appellant to Harris who gave it in turn to Moore. Moore put the glassine envelope into a manila envelope, which Harris signed; and later that evening Moore noted the circumstances of the purchase (time, date, place) on the envelope. He also wrote on the envelope at that time the name "Pete Dancy."

Moore also testified that, during the making of the sale, he was within two or three feet of appellant, and that the lighting conditions under which he observed appellant were good. He said that he then recognized appellant as a man he had seen before on an occasion when he gave a ride in his car to appellant and one "Cotton" Powell. Moore also said that he saw and recognized appellant at the latter's presentment before the U. S. Commissioner on April 1, 1963.

Appellant's testimony was a denial of making the sale on December 7, 1962, although he was unable to recall where he was and what he was doing on that day, except that he was not working at that time and was using drugs that were costing him about $25 per day. He said that he had known "Cotton" Powell for many years and that his [appellant's] friends called him "Pete."

Moore filed the complaint against appellant on March 15, 1963, and appellant, who was then in police custody on unrelated matters, was taken before the U. S. Commissioner on April 1, 1963. If the latter date be assumed to be the first time appellant knew of the claim that he

had violated the law the preceding December 7, the delay between offense and arrest was just under four months.[1]

## II

This court has recognized that some balance must be struck between the narcotics defendant's right to be convicted only upon a reasonably reliable identification, and the public interest in effective police control of the trafficking in illegal drugs. We have indicated that a delay of the order of four months or less might customarily be regarded within the latitudes where the public interest is dominant, although we have had to recognize that, even within these limits, there may be special circumstances of prejudice which place the defendant's interests in the ascendant. Woody v. United States, 125 U.S.App.D.C. 192, 195, 196, 370 F.2d 214, 217, 218 (1966). Because the police action here predated Ross we weigh this case narrowly by reference to the factual considerations deemed important in Ross.

By that standard we find no necessity to reverse. The delay here was less than four months; and appellant has advanced no peculiarly prejudicial consequences of that delay other than his general inability to reconstruct the events of the day of the alleged sale. Moreover, unlike Ross, Moore testified that he had seen appellant before December 7, recognized him that day, and recognized him again shortly after filing the complaint against him. It is reassuring to some degree that appellant admitted to knowing "Cotton" Powell, and that Moore wrote appellant's name on the contraband within a few hours after the sale. It is also to be remarked that Harris testified at the first trial in support of the Government's case, and failed to do so at the second trial only because he had disappeared. There are, thus, circumstances in this case which we have, since Ross, regarded as imparting some greater degree of substance to the undercover agent's identification than was true in Ross, where the agent, making the purchase alone, had never seen the defendant except at the moment of purchase and, a long time later, in the court room at trial.[2]

Appellant, through his appointed counsel, has ably pressed upon us what is essentially the argument that security against faulty identification can not be made to reside in arbitrary definitions of allowable time span. That argument, on the facts of this record and in the present state of our decisions, does not lead to nullification of this conviction. It does remind that we recognized its force in Ross when we noted that, the human memory being what it is, the difference between four and seven months, for example, may not be a universally meaningful one. We regarded Ross more as a challenge to the police than as a license—a challenge to exhibit some awareness of the very real dangers of misidentification lurking in the narcotics undercover agent practice, and to endeavor consciously to devise methods and procedures which would reduce those dangers as much as possible consistent with effective law enforcement.

One of the less impressive aspects of the evidentiary inquiry on our remand in Ross was the low level of authority within the Police Department at which the

1. Moore testified after refreshing his memory from his notes. He joined the Police Force in July, 1962; and, after three weeks formal training, began his undercover operations in August. The transaction involved in this case occurred midway through his eight months of service as an undercover agent. When that service was ended in March of 1963 he filed simultaneous complaints against 102 persons alleged to be narcotics offenders.

2. E. g., Morrison v. United States, 124 U.S.App.D.C. 330, 365 F.2d 521 (1966); Worthy v. United States, 122 U.S.App.D.C. 242, 352 F.2d 718 (1965), vacated and remanded for consideration on another ground, 384 U.S. 894, 86 S.Ct. 1961, 16 L.Ed.2d 1000 (1966); Powell v. United States, 122 U.S.App.D.C. 229, 352 F.2d 705 (1965); Jackson v. United States, 122 U.S.App.D.C. 124, 351 F.2d 821 (1965); Bey v. United States, 121 U.S.App.D.C. 337, 350 F.2d 467 (1965), cert. denied, 385 U.S. 905, 87 S.Ct. 218, 17 L.Ed.2d 136 (1966).

formulation of undercover agent policies was carried on, and the complete absence from the criteria employed "of the interest of an accused in knowing as soon as possible of the charge against him in order that he may prepare most effectively to rebut it." We said in *Ross* that we had no reason to think that the public and private interests could not be reasonably accommodated without sacrifice of the one or the other. Of the inevitability of such a sacrifice we said:

> Certainly there need be none if the Police Department in pursuing the one interest is not wholly oblivious of the other. Of course the Department must have some considerable latitude for the planning and organization of its undercover program, but this record suggests strongly that that latitude, if it were informed by any awareness whatsoever of the due process interest, could and would result in a program reasonably adequate to the demands made upon it by differing aspects of the public interest.

349 F.2d at 213.

With respect to arrests made subsequent to *Ross*, there will hopefully be some indication of a conscious response to this admonition not to leave the interests of the arrestee wholly out of account in planning the procedures to be followed by undercover agents. There is no reason why legal planning to achieve legitimate ends by appropriate means needs to be confined to minimizing estate taxes or facilitating corporate mergers. The police are carrying increasingly heavy responsibilities for the protection of the public interest, and they deserve and require greater resources of all kinds. One of them is certainly the bringing to bear on a problem such as this the wide-ranging and informed inventiveness which lawyers are called upon to supply every day to private and public clients.[3]

The judgment of conviction is

Affirmed.

---

3. A conscious effort to engineer the undercover system in order to strengthen its reliability would undoubtedly turn up a number of useful devices not necessarily involving a shortening of the period of underground service. Multiple transactions can, for example, be very helpful in corroborating identification even if less than all become the basis of punishment. The documentary record on identification could apparently be improved, since it appears to consist at the moment of random and unsystematic note-taking by individual officers. A standard form, with a check-list of identification features and other details, and designed to serve as a continuing file on the defendant in which all observations are to be entered, would appear to be worth consideration.