**UNITED STATES ex rel. Betty Jean GUY, Petitioner,**

v.

**Lewis McCAULEY, Superintendent of The Wisconsin Home for Women, Respondent.**

**Civ. A. No. 73–C–84.**

United States District Court, E. D. Wisconsin.

Dec. 9, 1974.

William M. Coffey, Milwaukee, Wis., for petitioner.

Robert W. Warren, Atty. Gen., and William A. Platz, Asst. Atty. Gen., Madison, Wis., for respondent.

## DECISION AND ORDER

JOHN W. REYNOLDS, Chief Judge.

Betty Jean Guy, presently incarcerated at the Wisconsin Home for Women, Taycheedah, Wisconsin, has petitioned this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 et seq.

On March 19, 1971, petitioner was found guilty of the sale of a dangerous drug (namely, cocaine), in violation of § 161.41(1m), Wis.Stats. A short time later, on April 2, 1971, the petitioner

was found guilty of possession of heroin, in violation of § 161.02(1), Wis.Stats. Petitioner was sentenced in both cases on April 2, 1971, to serve concurrent four-year terms in the Wisconsin Home for Women.

Petitioner has exhausted her state remedies pursuant to the requirements of 28 U.S.C. § 2254(b). She filed a motion to suppress in the trial court. A hearing on said motion was heard prior to trial, and the motion was denied by order of the Honorable L. J. Foley, Jr., Circuit Judge, Circuit Court of Milwaukee County. By stipulation of the parties, all testimony at the hearing on suppression was received as evidence for the purpose of trial. Petitioner appealed from the judgment and order of the circuit court, and in the decision of State v. Guy, 55 Wis.2d 83, 197 N.W.2d 774 (1972), the Wisconsin Supreme Court affirmed the circuit court. After examination of the trial court transcript and the opinion of the Wisconsin Supreme Court, I find that the grounds raised in this petition were raised before both the trial court and the appellate court.

There is no allegation that petitioner did not receive a full and fair evidentiary hearing at the state court level. Therefore, an evidentiary hearing was not warranted in this matter. On February 20, 1973, I granted petitioner leave to proceed in forma pauperis in this matter.

## I. FACTS

The facts, as they appear from the record, follow. On December 5, 1970, shortly before noon, petitioner was arrested at her home by several officers of the Milwaukee Police Department on an arrest warrant charging her with the sale of cocaine. The arresting officers were members of the narcotics division of the vice squad of the Milwaukee Police Department and were familiar with paraphernalia used by heroin users. While the officers were inside the petitioner's home and engaged in conversation with the petitioner, they observed on a bedroom nightstand various paraphernalia typically employed in the heating and administering of heroin. Present on this table were a couple hypodermic needles, an eyedropper, a glass of water, small pieces of copper wire, a "cooker" (a burned bottle cap with a wad of cotton in the middle) and white residue. A "cooker" is used to "cook up" the heroin before administering it into the arm.

One of the arresting officers, Detective Randa, advised two policewomen, Officers Atkinson and Honeck, to search petitioner. He gave no instructions about how the search was to be conducted but assumed that the policewomen knew how to search the petitioner. The search took place in the following manner. Petitioner and the two women police officers went into petitioner's bathroom and closed the door. At the time petitioner was clad only in a nightgown and underpants. In the bathroom she was told to strip, bend over, and spread her buttocks. It was difficult for petitioner to bend over because she was seven months pregnant, but she succeeded. The police women then looked into her privates and found nothing.

Detective Randa asked the policewomen, after they came out of the bathroom, if they had had a chance to search the petitioner "real well." Because of cramped quarters and poor lighting in the petitioner's bathroom, Officers Atkinson, Honeck, and Randa decided that petitioner should be transported to the vice squad section of the Safety Building in Milwaukee and searched a second time because there was more light and more room in the vice squad room.

Detective Randa testified that he had known petitioner for about six years in his capacity as a narcotics division officer, and that he had been involved in an earlier prosecution of petitioner for possession of heroin. In addition, Randa stated that he had been informed by a "reliable informer" four or five years before that petitioner was known to carry heroin in her vagina. He had known the informant for about seven years but did not know the occupation of

the informant. He also did not know where the informant got his information.

The search of the petitioner which ultimately caused her conviction for possession of heroin and the present petition took place in the vice squad room. Petitioner was again told to disrobe by the two policewomen. She disrobed, bent over, this time leaning on a chair, and one of the policewomen, using rubber gloves, assisted her in spreading her buttocks. While the second policewoman held an ordinary flashlight, the other observed the corner of a plastic container protruding from petitioner's vagina. Petitioner removed the container and gave it to the policewomen. The plastic bag was later determined to contain four smaller plastic packets. Subsequent chemical analysis established that they contained a total of .29 grams of heroin.

Policewoman Atkinson testified as to the search of female prisoners in general. The following exchange of questions and answers took place (Tr., at 117):

"Q. Now, why did you search her privates?

"A. It's a routine search of female prisoners.

"Q. You search all the privates of all female prisoners?

"A. Yes, I do.

"Q. For what did you search?

"A. Anything that they possibly might be carrying or concealing.

"Q. In this particular case, for what did you search?

"A. Heroin."

The facts further show that petitioner had several prior felony convictions. On March 25, 1969, she was convicted for possession of heroin and sentenced to not less than two and not more than six years. On or about August 30, 1967, she was convicted of forgery. She was sen-

tenced to not more than four years; execution of the sentence was stayed and she was placed on probation for two years. This was revoked and she was incarcerated at the Wisconsin Home for Women on or about June 26, 1968.

## II. JURISDICTION

Jurisdiction is present to decide this matter under 28 U.S.C. § 2254.[1] Petitioner is presently "in custody" pursuant to a judgment of a court of the State of Wisconsin and has exhausted her available remedies before resorting to this court.

██ Respondent argues that as a matter of judicial convenience this court should apply the concurrent sentence doctrine of Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), and refrain from deciding the instant matter. Respondent argues that since petitioner is serving two concurrent sentences and as long as a conviction is proper upon at least one count, the judgment should be supported. Respondent further argues that there are no collateral consequences which can be avoided by vacating the petitioner's conviction for possession of heroin. Respondent's arguments are rejected. The availability of the writ of habeas corpus has been greatly expanded by the United States Supreme Court. See Peyton v. Rowe, 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968); Carafas v. LaVallee, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968). As was stated in Hammond v. Lenfest, 398 F.2d 705 (2d Cir. 1968):

" * * * recent Supreme Court decisions have made clear that '[i]t [habeas corpus] is not now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose * * *.' "

The imposition of concurrent sentences imposes sufficient restraints on a peti-

1. Section 2254(a) reads as follows:
   "The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursu-

ant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."

tioner's liberty to require this court to consider her case on the merits. If petitioner was deprived of her constitutional rights because of an illegal search and seizure, the broad scope and "grand purpose" of the writ of habeas corpus requires this court to dispose of this as justice requires. If petitioner's constitutional rights were not abridged, she should be notified of the reasons for denying her petition, instead of this court's hiding behind the mask of "judicial convenience."

The petition is granted as this court finds that petitioner's constitutional rights were abridged for the reasons set forth in this opinion.

## III. LAW

The Fourth Amendment to the United States Constitution protects the right of " * * * the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures * * *." The purpose of the Fourth Amendment is " * * * to protect personal privacy and dignity against unwarranted intrusion by the State." Schmerber v. California, 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966). This signifies that *every* search must be analyzed and examined in the light of the Fourth Amendment's requirement that any search not be "unreasonable."

What does the "reasonableness" requirement of the Fourth Amendment mean? The following statement by Mr. Justice Frankfurter casts an illuminating light on a difficult question.

"To say that the search must be reasonable is to require some criterion of reason. It is no guide at all either for a jury or for district judges or the police to say that an 'unreasonable search' is forbidden—that the search must be reasonable. What is the test of reason which makes a search reasonable? The test is the reason underlying and expressed by the Fourth Amendment: the history and the experience which it embodies and the safeguards afforded by it against the evils to which it was a response. * * " United States v. Rabinowitz, 339 U.S. 56, 83, 70 S.Ct. 430, 443, 94 L.Ed. 653 (1950) (dissenting opinion).

During the past decade, the methodology of determining reasonableness has been seriously challenged. It was previously thought that there were no set formulae for determining reasonableness. For instance, in Sibron v. New York, 392 U.S. 40, 59, 88 S.Ct. 1889, 1901, 20 L.Ed. 2d 917 (1968), it is stated that "[t]he constitutional validity of a warrantless search is pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case."

Recently, however, the Supreme Court rejected the principle and found that the arresting authority possesses unqualified authority to search the person of the arrestee. In United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), the Supreme Court formulated that the valid arrest of an individual is *per se* a reasonable intrusion under the Fourth Amendment.[2] This being so,

2. The Court in United States v. Robinson, 414 U.S. 218, 225–226, 94 S.Ct. 467, 472, 38 L.Ed.2d 427 (1973), grounded its finding in several previous cases:

" * * * In *Chimel* [Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L. Ed.2d 685] where the Court overruled *Rabinowitz* and *Harris* [Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399] as to the area of permissible search incident to a lawful arrest, full recognition was again given to the authority to search the person of the arrestee:

" 'When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.' 395 U.S., at 762–763, 89 S.Ct., at 2040."

a search incident to the arrest requires no further justification. The Court stated at 235, 94 S.Ct. at 477:

> "* * * It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment."

In the instant case, it is uncontested that petitioner was arrested pursuant to a valid arrest warrant. Treating this in the same manner as the custodial arrest in *Robinson*, it would follow that the arresting officers had the authority to search. Two searches of the petitioner's person occurred. Both involved searches of the petitioner's vagina. The first took place in the bathroom of the petitioner's residence and resulted in no finding by the searching policewomen. The second occurred a short time later in the vice squad room of police headquarters. This latter search resulted in the discovery of a plastic container which held .29 grams of heroin.

■ In light of the recent cases— United States v. Robinson, supra; Gustafson v. Florida, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973); and United States v. Edwards, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974)— petitioner's contentions that the searches were in violation of the Fourth Amendment because first, the police officers did not have probable cause to search, and second, that there was no freely and voluntarily given consent to search, miss the mark. Petitioner's third contention deserves closer examination. She argues that even if the officers had the right to search her, they abused their right in that the manner in which the search was executed was unreasonable. Petitioner contends that the two strip searches in which she was forced to bend over and have her privates examined by nonmedical personnel in a nonmedical setting were in blatant violation of the due process clause of the Fifth Amendment.

Each amendment in the Bill of Rights protects different rights and has its particular genesis in separate historic concerns and considerations. The Fourth and Fifth Amendments are often thought of as companion pillars in our architectural scheme of democratic government, lifting the individual upward against arbitrary government abridgement of personal freedom and liberty. As was stated in Blackford v. United States, 247 F.2d 745, 748 (9th Cir. 1957):

> "* * * Though their ultimate goal be the same, the Amendments are the product of varied historical experience and they combat different evils. The Fourth Amendment safeguards the right to be free from unreasonable searches and seizures; the Fifth Amendment guarantees the individual against being compelled to give evidence against himself and also assures to him, under the Due Process proviso, fair and humane treatment by federal law enforcement officers. * * *"

Petitioner, in formulating that the Fifth Amendment guarantees that under no circumstances should nonmedical personnel be allowed to examine the body orifices of an arrestee, relies heavily on the case of Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), and its progeny.[3] The issue presented thus becomes whether the strip searches of petitioner by nonmedical police personnel violate "the general requirement that States in their prosecutions respect certain decencies of civilized conduct," *Rochin*, at 173, 72 S.Ct. at 210, and not offend "a sense of justice." Brown v. Mississippi, 297 U.S. 278, 285–286, 56 S.Ct. 461, 80 L.Ed. 682 (1936).

---

3. United States v. Robinson, supra, did not involve any *Rochin* issues. Mr. Justice Rehnquist stated at 236, 94 S.Ct. at 477:

"* * * While thorough, the search partook of none of the extreme or patently abusive characteristics which were held to violate the Due Process Clause of the Fourteenth Amendment in Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). * * *"

Rochin v. California, supra, involved a case in which police officers broke into the house of the accused. Observing him put something in his mouth, the officers unsuccessfully attempted to extract whatever was placed there. Rochin was taken to a hospital where his stomach was "pumped" by a physician. In the vomited matter narcotics were found. The Supreme Court found the actions of the police to obtain evidence such as "to offend even hardened sensibilities." *Rochin*, 342 U.S. at 172, 72 S.Ct. at 210. Rochin's conviction was set aside because such conduct "shocked the conscience" and was "so brutal and so offensive to human dignity" that it did not satisfy due process of law.

■ Applying these standards to the case at hand, I find that the instant situation falls within the specter of *Rochin*. The actions of the Milwaukee police shock the conscience of this court and this court's "hardened" sensibilities. The facts bear repetition.

Petitioner was searched twice. The first search was the result of entry into the petitioner's residence by several police officers pursuant to a valid arrest warrant, subsequent observation by these police officers of various paraphernalia commonly utilized in the heating and administering of heroin on petitioner's bedroom nightstand, and the presence of vague information several years old that petitioner was known to carry heroin in her vagina. This search took place in petitioner's own bathroom. At the time of the search, petitioner was clad only in a nightgown and underpants. The two policewomen present directed petitioner to lift up her nightgown, remove her underpants, bend over, and spread her buttocks. No touching occurred between the petitioner and the women officers. Since the bathroom was poorly lighted and quite small and since the door was closed to insure privacy, the policewomen were unable to conduct a thorough examination. It was determined that petitioner should get dressed and another search

would be held at police headquarters, and the petitioner was taken to the police headquarters to be searched.

The second search occurred a short time later in the vice squad room at police headquarters. Again, the two women police officers were present. Petitioner was asked to disrobe and bend over. To facilitate her bending because of difficulty caused by her pregnancy petitioner leaned on a chair. Officer Atkinson aided petitioner in spreading her buttocks, and Officer Honeck held a flashlight. The former was wearing rubber gloves, and the latter did not touch the petitioner. Officer Atkinson observed that there was a piece of cellophane protruding from petitioner's vagina. She requested that petitioner remove this from her vagina. Petitioner complied by removing a small cellophane bag. At no time did Officer Atkinson place a finger or a hand in any of the orifices of petitioner's body. The period of time which passed between the arrest and the second search was approximately one hour.

The police actions in this case abused common conceptions of decency and civilized conduct. It is true that the searches were carried out in what appear to have been sanitary conditions; that petitioner was never forced to lie down; that she was searched by other females; and that nothing was probed into any of her privates. These facts, however, do not overcome several other important facts. Petitioner, at the time of the searches, was seven months pregnant; she was painfully forced to bend over twice; and the two policewomen who perpetrated the search were not medically trained, nor did they utilize medical facilities or equipment to aid them in their search, nor was it done in a hospital or medical environment.

■ The due process clause of the Fifth Amendment requires that this decision be based on a community sense of what is decent and fair, not on anyone's personal conceptions of civilized conduct. As was so cogently stated by

the Supreme Court in Breithaupt v. Abram, 352 U.S. 432, 436, 77 S.Ct. 408, 410, 1 L.Ed.2d 448 (1957):

> "* * * due process is not measured by the yardstick of personal reaction or the sphymogram of the most sensitive person, but by that whole community sense of 'decency and fairness' that has been woven by common experience into the fabric of acceptable conduct. * * * "

While the probing and regarding of body cavities and sexual organs is a routine medical practice, it is not normal for it to be forced on individuals by nonmedical police personnel in nonmedical surroundings. This is an important distinction.[4]

The intrusion into or the examination of either the vaginal or anal cavities must be made by skilled medical technicians for at least two reasons. The first is that the examination be carried out under sanitary conditions so that the dangers of physical harm to the individual be reduced. Second, the magnitude of the intrusion to the individual's integrity and dignity becomes greater if the search is perpetrated by a police officer rather than a doctor or nurse.[5] Physical examinations, including at times the probing of body cavities, by medical personnel are common occurrences. We are subjected to them in the armed services, before getting married, and as a requirement to gaining access to many schools and jobs. Sound medical counseling dictates that we voluntarily undergo periodic medical checkups. These examinations may bother us, but they do not shock us. Indeed, many of these examinations are voluntary.

Physical examinations of sexual organs and/or body cavities by nonmedical personnel, however, are not routine to our everyday lives. In addition to being medically unsound, the forceful probing and examining of the vagina and anus by strangers attacks the very dignity, privacy, and integrity upon which our Constitution is founded.

This court notes that the testimony of Policewoman Atkinson is that the searches were routine searches for all female prisoners, and that she searched all the privates of all female prisoners. This record indicates that it is a common and routine practice in the City of Milwaukee to search the body cavities of females.[6] If this be true, this policy shocks this court.

What can be done to alleviate this offensive situation? There are various

---

4. In *Rochin*, where the conviction was set aside, a physician was responsible for forcing the emetic solution through the tube into Rochin's stomach, and this "stomach pumping" occurred in a hospital setting.

   In Breithaupt v. Abram, supra, where the conviction was not set aside, petitioner was likewise conveyed to a hospital where an attending physician withdrew the blood sample.

   Thus, the present case is distinguishable from both *Rochin* and *Breithaupt* on the grounds that the "search" did not take place in a hospital environment and was forced upon petitioner by two policewomen.

5. The importance of an individual's integrity cannot be overemphasized. As was stated by Mr. Justice Brennan in Schmerber v. California, 384 U.S. 757, 772, 86 S.Ct. 1826, 1836, 16 L.Ed.2d 908 (1966):

   "* * * The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions."

6. Police Officer Randa, in response to the question of why he directed the policewomen to search the petitioner, stated: "This is common to make a detailed custodial search for—Fruits or instrumentalities of crime." (Tr., at 230) When asked whether he gave the policewomen directions as to how the petitioner should be searched, Officer Randa answered: "No, I just told the policewoman to search her and these policewomen know how to search her." (Tr., at 231) In addition, after the first search in the petitioner's bathroom, Officer Randa asked the policewomen if they had searched the petitioner "real good." Policewoman Atkinson responded "no" to this question. (Tr., at 231)

methods for fostering compliance with the legal standards for arrest and for search and seizure. Some of these methods are negative. As in this case, the writ of habeas corpus is available to those individuals illegally held in custody. In criminal cases, courts may exclude from use as evidence the fruits of objects or statements procured by illegal searches and arrests, thus removing the incentives for police to disrespect the applicable legal standards. In other situations, society may promote compliance by holding police officers liable under either criminal prosecution, the Civil Rights Act, tort liability, or departmental discipline.

There are also various methods which are positive. One of these is by the promulgation of written guidelines for individual officers by the police department itself. Such promulgation requires consideration by the police department of their often unformulated arrest and search policies.[7]

Commentators have recently recognized the fact that the responsibilities and obligations placed on the shoulders of police officers require them to exercise large amounts of discretion.[8] Recognition of this discretion regularly exercised by police officers has led to concern that discretionary police activities be structured and controlled. See American Bar Association Standards Relating to the Urban Police Function (hereinafter "Urban Police Function"), § 4.2 (Approved Draft, 1973).

No internal rules or regulations of the Milwaukee Police Department dealing with this subject have been brought to the attention of this court. If such rules or regulations do not exist, they should. This court's decision has been made more difficult by the fact that this court could not measure the actions in the present case against any promulgated guidelines of the department. The treatment of an arrestee falls within the discretionary powers of a police officer, and it is an area where there is a potential for abuse.[9]

The police will benefit when they formulate their own guidelines. Unguided policemen should not be compelled to make quick decisions in "adrenalin-stimulated" situations.[10] Such enunciation of guidelines will allow the police adminis-

---

7. The latter method is relevant to the instant case because the record reveals that, as a general policy, the Milwaukee Police Department subjects all female arrestees to strip searches. What does not appear in the record is who made this decision—the Chief of Police of the City of Milwaukee, the individual officers, or custom.

8. W. LaFave, Arrest: The Decision to Take a Suspect into Custody 61–161, 490–527 (1965) ; H. Goldstein, Police Discretion: The Ideal Versus the Real, 23 Pub.Admin. Rev. 140 (1963) ; Remington & Rosenblum, The Criminal Law and the Legislative Process, 1960 U.Ill.L.F. 481.

9. Concerning this very subject, another commentator, Professor Anthony Amsterdam, recently stated :
   " * * * [I]nstitutional models have been proposed that would regularize and improve a process of citizen control over police practices. Both the National Crime Commission and the National Advisory Commission on Civil Disorders have recommended the greatly increased use of formal policy formulation and rulemaking procedures by police departments. They have urged, for example, the promulgation of written departmental directives governing 'such matters, among others, as the issuance of orders to citizens regarding their movements or activities, the handling of minor disputes, the safeguarding of the rights of free speech and free assembly, the selection and use of investigative methods, . . . the decision whether or not to arrest in specific situations involving specific crimes'. and '[t]he circumstances under which the various forms of physical force—including lethal force—can and should be applied.' Regulations of this sort would provide what the courts have never been able to supply: comprehensive and coherent definition of the rights of suspects, together with procedures for assuring that they are respected." Amsterdam, The Supreme Court and The Rights of Suspects in Criminal Cases, 45 N.Y.U.L.Rev. 785, 812 (1970) ; also quoted in Urban Police Function § 4.3, at 128–129.

10. Amsterdam, supra, at 812.

trators to institute imaginative approaches to law enforcement problems—approaches which may closely relate to the exigencies of law enforcement in a democratic society. Waiting for judicial responses to law enforcement issues, as in this case, is not a sound way to solve these problems, and the individual police officers are put in an unfortunate position. They are the recipients of a judicial order which often only applies to a particular factual situation. This negative regulation of police practices reduces the police to passive recipients of judicial thinking and diminishes their participation in the positive process of constructively formulating their own guidelines. Lawyers and judges have no monopoly on the market of creative and analytic thinking, which goal is self-improvement rather than destructive criticism. See McGowan, Constitutional Interpretation and Criminal Identification, 12 Wm. & Mary L.Rev. 235, 248 (1970).

Courts have increasingly asked police administrators to formulate guidelines. The seeds for these suggestions were first sowed in United States v. Wade, 388 U.S. 218, 239, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), when the Supreme Court directed that administrative regulations by local police departments would eliminate the risks of abuse at lineup proceedings. Circuit Judge McGowan, Circuit Court of Appeals, District of Columbia, has been responsible for insuring that the *Wade* suggestion did not wither on the vine. See Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230, 1237–1238 (1968); Dancy v. United States, 129 U.S.App.D.C. 413, 395 F.2d 636 (1965); and Ross v. United States, 121 U.S.App.D.C. 233, 349 F.2d 210, 213 (1965). In Clemons v. United States, supra, Judge McGowan bluntly states at 408 F.2d 1237:

" \* \* \* Any well-run department will presumably prepare—and enforce —careful regulations \* \* \* for the guidance of its personnel \* \* \*."

The McGowan approach recently ripened in § 4.3 of the Urban Police Function, supra, at 125. Section 4.3 states:

"Police discretion can best be structured and controlled through the process of administrative rule-making by police agencies. Police administrators should, therefore, give the highest priority to the formulation of administrative rules governing the exercise of discretion, particularly in the areas of selective enforcement, investigative techniques, and enforcement methods." [11]

In conclusion, the petition for a writ of habeas corpus is granted. Granting the writ in this instance is only one method of promoting compliance with the legal standards of search and seizure. It is a negative judicial action to an alarming problem. The negativistic response of this court will hopefully not prevent constructive policymaking by the police administrators to develop new and imaginative approaches to a difficult area of the law; in fact, their response is invited.

For the reasons stated above,

It is ordered that the petition for a writ of habeas corpus be and it hereby is granted.

---

11. The Standards Relating to the Urban Police Function have been approved and accepted as its own by the National Association of Police Chiefs. The President's Commission on Law Enforcement and Administration of Justice in The Challenge of Crime in a Free Society (1967), at 104, recommended a similar proposition.