Robert SALINAS, By His Guardian, Melody Salinas, By Her Guardian, Rodney Salinas, By His Guardian, Russell Salinas, By His Guardian, Robert Salinas, Sr., and Carolyn Salinas, Plaintiffs,

v.

Chief Harold BREIER, Individually and in His Capacity as Police Chief of the City of Milwaukee, Defendant.

Civ. A. No. 76–C–42.

United States District Court,
E. D. Wisconsin.

July 15, 1981.

Kevin E. O'Neill, Milwaukee, Wis., for plaintiffs.

Grant F. Langley, Asst. City Atty., Milwaukee, Wis., for defendant.

## DECISION and ORDER

TERENCE T. EVANS, District Judge.

In this action, brought pursuant to 42 U.S.C. § 1983, plaintiffs allege that officers

of the Milwaukee Police Department conducted illegal searches of Carolyn Salinas and her four young children. Trial to the court was held February 10 and 11, 1981. The following decision constitutes my findings of fact and conclusions of law.

On January 24, 1974, Robert and Carolyn Salinas and four of their children were returning by auto to Milwaukee from a trip to Texas. As their car stopped at a red light at 4th and Lapham in Milwaukee, it was surrounded by Milwaukee Police officers and drug agents from the Federal Drug Enforcement Administration. The officers had a federal bench warrant for the arrest of Robert Salinas. They were also acting on a tip that he was transporting heroin to Wisconsin from Texas. Some officers had their guns drawn; one put a gun to Robert Salinas' head.

Robert Salinas was transported to the Police Administration Building in downtown Milwaukee, and a decision was made to take Mrs. Salinas and the children downtown as well. The police held them at the scene of the stop until two police matrons, Audrey Reiter and Janet Boyle, arrived, at which time all were taken to the Police Administration Building to what was described by Mrs. Salinas as a large room with smaller interrogation rooms adjoining it. It was in fact the Vice Squad Assembly Room.

It is undisputed that while in the Assembly Room, patdown searches of the Salinas family occurred, and that at some point Carolyn Salinas' purse was searched. The police deny that any strip or body cavity searches occurred. I find, however, that they did.

I find that Carolyn Salinas was taken into one of the interrogation rooms where a policewoman told her she was going to be searched. Carolyn Salinas described in detail how one by one her items of clothing were removed, how her arms, fingers, armpits, and back were searched for needlemarks. Then Carolyn Salinas was told to bend over and she described how she then felt "pokings in the rectal area and then the vagina area." I find Mrs. Salinas' testimony to be a truthful account of the episode.

When Mrs. Salinas was allowed to dress and return to her children in the Assembly Room, her 9 year-old son Robert was taken into an interrogation room. Robert was told to take off his clothes. A policeman told him to bend over, and a finger probe search of his body began. When he returned to the Assembly Room he was alternately giggling and crying.

Melody Salinas, who was then 8 years old, was also taken into a room where she testified that a policewoman searched her. She was told to remove her clothing:

"And then she started feeling in me and poking me and stuff. And then I started to pull away and started to cry and then she let me go. She goes, okay, put your clothes back on."

Three year-old Rodney and Russell, who was just a baby, were also taken into interrogation rooms. When Rodney returned, his clothing was not buttoned correctly, and when Russell was returned to his mother, his paper diaper was on backwards.

After the searches, the family was taken to the Police Garage where their car was parked. They were not allowed to drive the car home as the police apparently wanted it detained. A ride home in a police squad was arranged.

The Milwaukee Police Department has no official arrest record for Carolyn Salinas or any of the children. One of the officers present at the arrest of Robert Salinas stated that Carolyn and the children were not arrested. Chief Breier testified at trial that:

"It's my understanding that they were not under arrest, they were free to go. They were fed. They were free to go and they were taken home. They could have gone at any time. And it's my understanding that the only reason they were taken off the freeway was for their own safety." Tr. p. 280.

I find that Carolyn Salinas and the children were not free to leave "at any time." They were in custody, whether an official arrest record exists or not. Here, however, they are not alleging that the arrest was

illegal; they are alleging that the searches they were forced to undergo at the Police Administration Building Vice Squad Assembly Room were in violation of their Fourth and Fourteenth Amendment rights.

Defendant Breier, Police Chief of the City of Milwaukee, does not defend on the ground that the searches were reasonable under the Fourth Amendment, but rather that because he did not personally participate in the searches he cannot be held liable for damages. He urges that because he cannot be held responsible in any case, that I make no finding whatsoever on the constitutionality of the searches.

█ I find, however, that the searches were unreasonable and in violation of plaintiffs' Fourth Amendment rights. The searches here took place about four years after a similar search occurred in *United States ex rel. Betty Jean Guy v. Lewis McCauley,* 385 F.Supp. 193 (E.D.Wis.1974).

In *Guy,* the plaintiff was arrested on a warrant in her home on December 5, 1970. While making the arrest, police officers observed drug paraphernalia on a bedstand. The arresting officer told two women police officers, including a woman named Alice Atkinson, to search Guy. He gave no instructions but said that he assumed the women knew how to search her. Guy was taken to her bathroom where she was told to strip, to bend over, and to spread her buttocks. The policewomen examined her thoroughly, but there was no touching of her body. A decision was made to take Guy to Headquarters and search her again in the Vice Squad. She was again stripped and one of the policewomen, using rubber gloves, assisted her in spreading her buttocks. Eventually the policewomen saw a plastic container protruding from her vagina. Guy removed it. The policewomen, according to the decision, never placed either fingers or hands in the orifices of Guy's body.

The *Guy* search was analyzed by Judge John W. Reynolds of this district. Because Guy was validly arrested, the court found that the police had the right to search her. *U.S. v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). However, Judge Reynolds found that the search "abused common conceptions of decency and civilized conduct." At 198. In concluding that the search was unreasonable, he relied on cases decided much earlier—*Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), and *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936).

Here, although there is no question that the arrest of Robert Salinas was valid, the "arrest" of his wife Carolyn and the children is at the very least questionable. Even assuming the legality of the decision to take Carolyn Salinas and the children into custody, the search cannot be justified. In fact, the searches under consideration here shock my conscience.

Because Carolyn Salinas was the wife, and Robert, Melody, Rodney and Russell were the children of a suspected drug dealer, they were subjected to degrading and humiliating searches. The searches were far more thorough than could be justified by any conceivable safety precautions. The police were unquestionably looking for drugs. The Salinas family was safely in police custody, but no attempt was made to obtain a search warrant. The incident is appalling. The searches were a violation of the plaintiffs' Fourth and Fourteenth Amendment rights.

Having determined the illegality of the searches, the issue then becomes whether Chief Breier, the only named defendant, is liable in damages for the unconstitutional conduct of the officers.

Plaintiffs argue that because Chief Breier was named as the defendant in both his individual capacity and in his capacity as Police Chief of the City of Milwaukee, they are in fact suing the city as a corporate entity. They go on to argue on the basis of *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), that the city has no immunity in a 1983 action, and that the city is accountable for any actions of its employees taken as a result of city policy which resulted from either action or inaction on the city's part.

Defendant argues that the city's strip and body cavity search policy at the time of the searches in question met constitutional requirements and that, relying on *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), plaintiffs have failed to prove a causal connection between any policy of Chief Breier and the violation of their constitutional rights.

■ Chief Breier cannot be held liable under § 1983 solely by operation of the doctrine of *respondeat superior*. *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Boettger v. Moore*, 483 F.2d 86 (9th Cir. 1973). He can, however, be held liable if a sufficient causal connection can be established between his actions and the injury. *McClelland v. Facteau*, 610 F.2d 693 (10th Cir. 1979); *Wanger v. Bonner*, 621 F.2d 675 (5th Cir. 1980).

Chief Breier relies on *Rizzo v. Goode, supra*, as support for his argument that no causal connection can be established between the injury and his conduct. At first glance, that reliance seems justified. In *Monell, supra*, at 694 n.58, 98 S.Ct. at 2037 n.58, the court stated, "By our decision in *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), we would appear to have decided that the mere right to control without any control or direction being exercised and without any failure to supervise is not enough to support section 1983 liability." However, it is necessary to examine *Rizzo* carefully.

The Supreme Court described the *Rizzo* case as "an attempt by the federal judiciary to resolve a 'controversy' between the entire citizenry of Philadelphia and the petitioning elected and appointed officials over what steps might ... '... have the potential for prevention of future police misconduct.'" At 371, 96 S.Ct. at 604. The court determined that the members of the class of citizens who originally brought suit lacked standing because, having not personally been subjected to police misconduct, they lacked a "personal stake in the outcome." Additionally, the court determined that the broad injunctive relief—ordering the police to submit a comprehensive program for handling citizen complaints alleging police misconduct—was on the facts of that case, an "unwarranted intrusion by the federal judiciary into the discretionary authority" of the police.

Since the *Rizzo* decision, courts have pointed to the limits of its holding. Courts have seen *Rizzo* as limited to supervisory injunctive relief, which constitutes the broad federal interference with state institutions which the court decried. *Lyons v. City of Los Angeles*, 615 F.2d 1243 (9th Cir. 1980), *cert. den.* 449 U.S. 934, 101 S.Ct. 333, 66 L.Ed.2d 158. In *Santiago v. Philadelphia*, 435 F.Supp. 136 (E.D.Pa.1977), the court stated that *Rizzo* did not say that a failure to supervise could never be a basis for liability. And in this district, the distinction has been drawn as follows:

"The plaintiffs in this action seek money damages for past incidents of alleged police misconduct directed against them, not sweeping equitable relief to prevent possible future misconduct directed against a class." *McKee v. Breier*, 417 F.Supp. 189 (E.D.Wis.1976).

As in *McKee*, plaintiffs here seek damages for an egregious violation of their civil rights; they do not request any supervisory injunction which would interfere with police autonomy. In these circumstances, *Rizzo* is no bar to recovery.

■ Courts have found the required causal connection between a supervisory employee and an alleged violation to be established in several ways depending on whether or not the facts are sufficiently compelling. A supervisor's deliberately indifferent failure to supervise misconduct of which he has notice may lead to liability. *McClelland v. Facteau, supra; Turpin v. Mailet*, 619 F.2d 196 (2d Cir. 1979), *cert. den.* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475; *Little v. Walker*, 552 F.2d 193 (7th Cir. 1977), *cert. den.* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 530; *Owens v. Haas*, 601 F.2d 1242 (2d Cir. 1979), *cert. den.* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407. A supervisor may be found liable for negli-

gence in his duty to train subordinates and to establish department procedures to protect citizens' rights. *McClelland, supra.* While it is clear that the causal link must be established between the failure to train and the unconstitutional act, in some cases, "a single, brutal incident such as this may be sufficient to suggest that link." *Owens v. Haas,* at 1246. Also in *Turpin v. Mailet,* at 202 the court stated "... a single, unusually brutal or egregious beating administered by a group of municipal employees may be sufficiently out of the ordinary to warrant an inference that it was attributable to inadequate training or supervision amounting to deliberate indifference or 'gross negligence' on the part of officials in charge."

The usual approach in finding liability on the part of supervisors or of a governing body is to find that they promulgated an unconstitutional official policy or promoted an unconstitutional custom, which led to the violation. *Monell, supra.* Building on this approach, courts have stated that an official policy can be inferred from the omissions of supervisory officials as well as from their acts. *Turpin v. Mailet, supra.* In addition, in *Collier v. Miller,* 414 F.Supp. 1357 (S.D. Tex.1976), the court found that although there was a written policy which would not condone a certain search procedure, "the absence of any specific and limiting guidelines in the policy vests the searching officer with an impermissibly broad power to invade the rights of the public to be free from unreasonable searches."

At the time the Salinas family was searched, the Milwaukee Police Department had no rules or regulations in effect governing strip or body cavity searches. Police Officer Audrey Reiter could point to nothing in the Police Officer's Manual or the Department Manual or in any written rules to cover the situation. She testified that there was no rule which stated that an officer could not touch the buttocks of a person being searched. Leonard W. Ziolkowski, Deputy Inspector of Police, who is responsible for training all police officers, testified that "[T]here is no broad, (sic) specific rule dealing with the search of pris-

oners." Tr. p. 212. Leroy A. Jahnke, First Deputy Inspector of the Milwaukee Police Department, testified that there is no rule or guideline as to what a male officer should tell a female officer when he requests her to search a female prisoner. At one point he said that the female officer is expected to contact her immediate supervisor before the search is made; however later he testified that that was not necessary. Tr. p. 168–170. In *Guy, supra,* the court stated that "No internal rules or regulations of the Milwaukee Police Department dealing with this subject have been brought to the attention of this court." Likewise, nothing specific has been brought to my attention.

At trial, the defendant's witnesses attempted to extrapolate from various documents a policy of the department regarding searches. Inspector Jahnke stated that the policy of the department on body cavity searches was that they are never done under any conditions with "the exception when ... probable cause existed, that a search warrant would then be obtained and the search would then be conducted by a, in a sanitary surrounding, by a licensed physician." Tr. p. 155. He stated that strip searches are conducted on adult prisoners when probable cause exists.

Inspector Ziolkowski referred to a document entitled "Milwaukee Police Academy, Search and Seizure." The document is used in recruit training programs, and Ziolkowski states that it contains the policy of the department. It is indeed the most comprehensive statement of department policy pointed to by any of the witnesses:

"Sometimes complete disrobing of a person may be required and sometimes search of body cavities may also be required, but that such detailed searches should be made only in extraordinary cases. Probable cause to believe something is hidden must be present. Search of body cavities should be by a doctor and under sanitary conditions. Only such force as is necessary should be used. That except in emergencies, obtain a search warrant first."

Assuming that this represents the policy of the Milwaukee Police Department, I find that it is so vague that it does not offer a police officer clear guidelines necessary to prevent the kind of search the Salinas family underwent. It states that "sometimes" disrobing is required and "searches of body cavities are required, but these should be made only in 'extraordinary cases.'" "Sometimes" is never defined. No example of an "extraordinary" situation is given; no definition of "extraordinary" is given unless the following sentence is meant to be a definition—that is, "probable cause to believe something is hidden must be present." If that sentence is the definition of extraordinary, then the policy of the department is that if probable cause exists to believe something is hidden, then the police are confronted with an extraordinary case which would allow a strip or body cavity search. The statement also says that a search of a body cavity should be made by a doctor with only such force as is necessary. Is it the doctor who is going to use force? Finally, the police are instructed to obtain a search warrant except in emergencies. Once again, the police officer is allowed broad discretion to determine what an emergency is.

This policy allows a police officer to act within its boundaries and conduct illegal searches. It, in fact, could be interpreted to allow the strip searches of the Salinas family, depending on whether the officers believe something was hidden.

In addition, no definitions exist in the "policy" of "strip search" or "body cavity search." At trial much confusion existed even among high-ranking officers as to what those definitions are. When I personally questioned Inspector Ziolkowski regarding the difference between a strip and a body cavity search, the following occurred:

"The Court: . . . I want to be absolutely sure I understand the definitions you've been using during your testimony. The disrobing of an arrested person and a visual examination of that person, by your definition, would be a simple strip search?

"A. Yes, Sir.

"The Court: When that person is stripped and the buttocks are spread so that an officer can look into the cavity area, would that qualify as a body cavity search under your definition, or would that still be a strip search?

"A. That's still part of the strip search.

"The Court: It only becomes a body cavity search if you go in either with a hand, a finger, an instrument, or something of that nature?

"A. An actual—

"The Court: An actual entry?

"A. Yeah, the passing the surface of the skin.

"The Court: Alright. With other than the eyes?

"A. Yeah."

Later I asked the following questions:

"The Court: . . . Is it a body cavity search if the officer spreads the buttocks of an arrested person?

"A. I would say yes.

"The Court: Then it becomes a body cavity search?

"A. Yes.

"The Court: Even if the officer doesn't enter or use anything to enter?

"A. I think it's a—it's actually the tipping point. The actual—I think as long as the officer isn't entering, you could still consider it a strip search. But I think you're getting on very dangerous ground, and I think the court in taking the total circumstances of the situation in account, has to decide in that specific case whether the officer acted properly or not."

■ Strip searches and body cavity searches are massive invasions of personal privacy. They can be tolerated only in the most extraordinary of circumstances. A policy permitting them must be tightly drawn to assure that significant Fourth Amendment constitutional rights will not be violated. The Milwaukee Police Department "policy" falls short of articulating a

limited, specifically defined, set of guidelines that would permit its officers to properly act in this very sensitive area.

It is no wonder that based on the confusion that existed over the "policy", the custom of the Milwaukee Police Department was as police officer Audrey Reiter described. She stated that it is the ordinary practice to have two policewomen or matrons take a female into an interrogation room, that one person would observe "the subject while she disrobes and gives her clothes to the other, who goes through the pockets, the linings, . . ." She said that this is what she was trained to do. Reiter, while denying that she ever spread the buttocks of female prisoners, stated that since 1969 she had observed Alice Atkinson Swessel, the policewoman involved in *Guy v. McCauley,* doing it. Officer Reiter's testimony is entitled to great weight in my view, and is bolstered by testimony of Alice Atkinson Swessel, quoted in the *Guy* decision at 195:

> "Q. Now why did you search her privates?
>
> "A. It's a routine search of female prisoners.
>
> "Q. You search all the privates of all female prisoners?
>
> "A. Yes I do."

Officer Reiter's testimony is bolstered by the statement in *Guy* that "this record indicates that it is a common and routine practice in the City of Milwaukee to search the body cavities of females."

At trial, I had the following exchange with Chief Breier as to his evaluation of Audrey Reiter's testimony:

> "The Court: Did she say anything during her testimony today on the stand that struck you as being violative of the policy of the department?
>
> "A. Not really."

The searches in this case were not the clandestine act of a few policemen. They were done in the open by officers who believed their actions to be permissible. None of the officers present thought that the searches went too far. This further demonstrates that practice was sanctioned by the policy, or more accurately, the non-policy of the Department.

I find that the policy and custom of the Police Department of the City of Milwaukee could reasonably be interpreted by a police officer to allow the kind of tragic searches that occurred here. This is a situation in which there were no clear rules or regulations to guide the officers and where the only policy testified to is extrapolated after the fact. Even the extrapolated policy is too vague to offer guidance and those responsible for formulating the policy are not clear about what the words mean.

■ It is a situation where the "policy" of the department allowed an unconstitutional custom or practice to exist in the Department. Chief Breier, as the head of the Department, is responsible for that custom and must be held accountable for it. He has, however, denied responsibility for the actions of the police officers. In answer to a hypothetical question he stated:

> "Q. . . . Do you feel, therefore, responsible for the lack of general good conduct because of the testimony that a person under your control did not follow the rules of your department? . . .
>
> "A. No, sir, I don't feel that I'm responsible. I was not there. I gave no direction. It wasn't according to the rules of the department or the policies of the department; therefore, I don't feel that I'm responsible for that particular conduct."

His denials of responsibility only emphasize that his officers on the line get the message that they are not violating any policy of the Department when they conduct searches such as those described here.

Chief Breier cannot shed his responsibility for these incidents. As the Court of Appeals for this circuit stated in a somewhat different context, "A prison official may not take solace in ostrichism." *Little v. Walker,* 552 F.2d 193 (7th Cir. 1977). Neither may a Chief of Police of a major city.

■ As to damages, I find that Carolyn was conscious of the humiliation and should

recover $10,000. I find that Melody, Robert, Rodney and Russell were less aware of what was happening, and that reasonable compensation to them would be $2,000 for Melody and Robert, and $1,000 for Rodney and Russell.

IT IS THEREFORE ORDERED that plaintiff Carolyn Salinas recover from the defendant $10,000.00.

IT IS FURTHER ORDERED that Melody Salinas recover $2,000.00.

IT IS FURTHER ORDERED that Robert Salinas, Jr. recover $2,000.00.

IT IS FURTHER ORDERED that Rodney Salinas recover $1,000.00.

IT IS FURTHER ORDERED that Russell Salinas recover $1,000.00.

IT IS FURTHER ORDERED that the claim of Robert Salinas, Sr., is dismissed.

IT IS FURTHER ORDERED that upon application by the plaintiffs' attorney, plaintiffs will recover reasonable attorneys' fees incurred in this action.