STATE, Respondent, v. GUY, Appellant.

No. State 199. *Argued May 4, 1972.—Decided June 8, 1972.*
(Also reported in 197 N. W. 2d 774.)

84

For the appellant there was a brief and oral argument by *Bruce C. O'Neill* of Milwaukee.

For the respondent the cause was argued by *Richard J. Boyd,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

.

ROBERT W. HANSEN, J. While the challenged search of the person of defendant was conducted while she was in custody at the police station, the trial court did not hold it to be reasonable as a routine in-custody search. Instead it held that "under these circumstances" the search was reasonable. The presence of probable cause to believe that the defendant was concealing heroin in her person made the search, particularly the manner of search, constitutionally reasonable. We agree that probable cause was here required for the search as here conducted, and agree that probable cause was here present.

Following the hearing before trial on the motion to suppress evidence secured by search, the trial court held that: ". . . this woman had this criminal reputation, this paraphernalia was on the table, and the Court would rule that as a matter of law that they [the narcotics division officers] had a right to make a reasonable search from that point on." Probable cause here existed if facts and circumstances known to the arresting officers warranted a reasonable police officer to believe that the defendant was in possession of heroin, concealed in or on her person. (See: Molina v. State (1972), 53 Wis. 2d 662, 671, 193 N. W. 2d 874.) On this record, such probable cause arose, as the trial court found, from the following facts and circumstances.

*Heroin paraphernalia.*

In finding probable cause, the trial court noted "this paraphernalia was on the table." The reference is to testimony at the hearing on the motion to suppress that the arresting officers, prior to the search here challenged and at the home of the defendant, observed certain items on the night table in defendant's bedroom. The officer in charge at the time of arrest, John Randa, testified that he observed:

"A couple of hypodermic needles, an eyedropper, a disposable type eyedropper or disposable type hypodermic

needle, glass of water and some small pieces of copper wire. . . . There was also a, what we call a cooker, a burned bottle cap with a wad of cotton in the middle and residue, white residue around the inside of the cooker. . . . It is used to cook up the heroin before administering it to the drug, administering the drug into the arm."

The law officer giving this conclusion had been a member of the vice squad of the Milwaukee police department for nineteen and one-half years, and had years of experience with the narcotics division and a broad background of knowledge and experience with procedures and paraphernalia for administering narcotics, and particularly heroin.

In a very analogous case where the police officer saw a waxed paper bag containing a dark substance next to a corncob pipe, in the light of the officer's knowledge of the common use of waxed paper bags as containers for marijuana and of corncob pipes by marijuana smokers, a California court held that the officer had reasonable cause or probable cause to believe that the defendant in that case was in possession of marijuana. (*People v. Ouellette* (1969), 271 Cal. App. 2d 33, 38, 76 Cal. Rptr. 346.) In another California case, the police officer observed the defendant lying on a bed and saw a balloon and a spoon, which the officer recognized as narcotics paraphernalia. While holding that the articles, in plain sight, were not the object of search, the California court termed them "objects which are customarily used in the administering of narcotics." (*People v. Lawson* (1969), 1 Cal. App. 3d 729, 731, 81 Cal. Rptr. 883.) In both California cases, as in the case before us, the issue was determined in light of the officer's knowledge, including his experience and expertise as to the manner in which heroin or marijuana is administered.

*Prior heroin conviction.*

In finding probable cause for the search of the person of defendant, the trial court noted the prior "criminal

reputation" of the defendant. This was, in part, a reference to the conviction of the defendant in 1968 on the charge of possession of heroin. The officer in charge at the time of arrest, John Randa, testified that he was personally involved in the 1968 case, and was aware that the defendant in 1968 was a user of heroin and that she had been arrested, convicted and sentenced to prison for possession of heroin. The fact, known to the police, that defendant was a user of heroin and had been convicted in 1968 for possession of heroin clearly was a surrounding circumstance supporting the reasonableness of believing that she had heroin in her possession at the time of her arrest.

### Prior heroin concealment.

Additionally, what the trial court termed the "criminal reputation" of the defendant went beyond police knowledge of her earlier conviction on a heroin charge. The officer in charge of the arrest, John Randa, testified that, prior to the time of arrest and search here, he had been informed that this defendant on occasion carried or concealed heroin in her vagina. At the hearing on motion to suppress, he testified he had been informed of this practice and place of concealment "four or five years prior to this" by "a reliable informer." He testified that he had had transactions with this informer before. This information from a reliable informer, known to the police at the time of the search here, is a material surrounding circumstance on the question of whether probable cause existed for the belief that the defendant had heroin concealed on her person. In the consideration of circumstances involved under the reasonable person test as to probable cause, facts and circumstances that alone might not support a conviction beyond reasonable doubt are properly considered in determining whether a reasonable police officer, under such circumstances, would reasonably believe a certain fact or situation

existed. (*Kluck v. State* (1967), 37 Wis. 2d 378, 389, 155 N. W. 2d 26.)

*Fresh needle marks.*

At the time of trial, one of the arresting officers, Thomas McKale, testified that, when the defendant was placed under arrest on the charge of selling cocaine, he observed ". . . scar tissue on her left forearm, observed needle marks, one very fresh, others very recent." Asked what he associated such needle marks with, the officer answered, "Use of a narcotic drug through intravenous injection." Asked how he determined that the needle marks on defendant's arm were fresh ones, the officer answered, "Well, there was one injection depot that was fresh, the blood was still fresh around the injection depot."

At the time of trial the defendant denied having needle marks on her arm. However, the trial judge thereupon examined her arms, and observed both marks and a collapsing of the veins. Prior to trial the prosecutor had moved to reopen the hearing on the motion to suppress in order to make the testimony as to fresh needle marks a part of the record of the hearing, as well as of the trial. The motion was denied, the trial court commenting, ". . . I don't think it has any effect on the total picture in this matter." If no more was being said than that, sufficient evidence to establish probable cause having been introduced at the hearing, no more was needed, the ruling and comment are correct enough. However, if there is any implication that the proof of fresh needle marks was not a highly relevant and probative circumstance on the issue of probable cause, then it is to be negatived. Clearly, the observing of fresh or recent needle marks on the arm of defendant, in fact, the observing of needle marks at all, would be a circumstance leading a reasonable police officer to believe that the person needle-marked was using or in possession of

narcotics. Here it was not needed, so no error was involved in its exclusion.

*Length of sentence.*

The defendant also requests that ". . . this court modify the trial court's judgment of sentencing as to her conviction of sale of cocaine, or vacate same and remand to the trial court for sentencing. . . ." While apparently based on the hope of reversal of the conviction for possession of heroin, the request merits a comment on the sentence or sentences imposed.

The defendant was sentenced to four years in the Wisconsin Home for Women on the conviction for possession of heroin. (The maximum statutory penalty is ten years.) On the same day, the defendant was sentenced to four years in the Wisconsin Home for Women on the conviction for sale of cocaine. (The maximum statutory penalty is five years.) Both sentences were to run concurrently. Additionally, both sentences were to run concurrently with a sentence the defendant was then serving.

Taking into consideration that her incarceration on the 1968 heroin conviction prevented recidivism for the period of incarceration, the defendant had a rather extensive criminal record: Child neglect—1965; Lewd and lascivious behavior—1967; Forgery—1967; Possession of heroin—1968. Under the penalty provisions of the Narcotics Act (sec. 161.28 (1), Stats.), she could have been charged as a repeater on the heroin charge, and could have received a sentence of not less than five years nor more than ten years as such repeater. The trial court set forth its reasons for the sentences imposed, including the need for rehabilitation of the defendant. Neither sentence viewed separately, or both viewed together, come anywhere near the limits of judicial discretion. If they err, it certainly is not on the side of excessiveness.

*By the Court.*—Judgment and order affirmed.

HALLOWS, C. J. *(dissenting)*. On the facts presented, the question of probable cause is a close question, but I do not reach its solution because I believe, probable cause or not, a policewoman should not be allowed to search the vagina of a suspect. I agree there may be a need for such a search in narcotic cases. I agree, too, with the dissent and the trial court in their criticism of the alleged police practice. But I would go farther. A suspect and even a criminal is a human being with rights; one of these is the right of privacy which includes the sacredness of his body. My concept of justice and respect for the dignity of a human being rebels against allowing a lay person to search the privates of another person. This should be done only by a physician so authorized by a court on probable cause. Anything less is not a reasonable search within the meaning of the constitution to my way of thinking.

HEFFERNAN, J. *(dissenting)*. The police practice which led to the search of Betty Veronica Jean Guy is revealed by the testimony of a policewoman at the hearing on the motion to suppress evidence. The following exchange took place between defense counsel and the police witness:

"*Q.* Now, why did you search her privates?
"*A.* It's a routine search of female prisoners.
"*Q.* You search all the privates of all female prisoners.
"*A.* Yes, I do."

Police Officer Randa was asked why this particular defendant was directed to be searched in the bathroom by the policewoman. He answered, "This is common to make a detailed custodial search for—fruits or instrumentalities of crime." When Officer Randa was asked whether the policewoman was given directions as to "how or where this defendant should be searched," he answered, "No, I just told the policewoman to search her and these policewomen know how to search her."

The record reveals a common police practice of searching the body cavities of female prisoners. The attorney general defended this unconstitutional intrusion and stated that it was permissible as a search incident to arrest or as a routine custodial search at the time of booking.

I applaud the majority opinion in its refusal to justify the search on the basis urged by the attorney general's office. Also, the trial judge sternly and properly admonished the Milwaukee police department, stating:

"I think that the police department should be advised that they are not to have people completely undressed and examine the orifices of their body without probable cause as a routine matter, absolutely not acceptable under constitutional law . . . ."

The trial judge, while concluding that the evidence in this case should not be suppressed, said:

"I point out to the police department particularly, beware of going beyond this particular area, I am not making any kind of a rule of law that says that you can go into the orifices of a person's body under any and all circumstances, you have got to start with probable cause, you have got to start with search incident of arrest to protect evidence, you have got to have the time element involved where you cannot get to a court without danger of destroying the evidence and you must use sanitary conditions and good medical procedures."

I agree with the opinion of this court and the trial court in their holding that the search must be justified by a finding of probable cause. I disagree with the finding that probable cause was demonstrated. The majority opinion overlooks the essential elements that must be demonstrated to show probable cause and which are required by *Spinelli v. United States* (1969), 393 U. S. 410, 89 Sup. Ct. 584, 21 L. Ed. 2d 637. The same omission was pointed out in the dissent to *Molina v. State* (1972), 53 Wis. 2d 662, 193 N. W. 2d 874. In my dissent to that case and to which I adhere, it was stated:

"There must be evidence that the person giving the information was of proved reliability *and* there must be a showing of the underlying circumstances revealing how the informer received his information, so that the reliability of the informant's tip can be appraised." (P. 686)

*Spinelli, supra,* page 415, points out that a magistrate fails in his constitutional duty if in determining probable cause he relies upon an informer whose reliability has not been demonstrated in accordance with the tests of *Aguilar v. Texas* (1964), 378 U. S. 108, 84 Sup. Ct. 1509, 12 L. Ed. 2d 723, and of *Spinelli, supra.* The twofold test must be satisfied.

A review of the record is appropriate. Betty Guy, on October 16, 1970, in her home sold cocaine to a plainclothes member of the vice squad. She has been separately charged and convicted for that sale, and that conviction is not at issue in the present appeal. The officer made the purchase in Betty Guy's bedroom. He asked her if she had "horse" (heroin). She said no that she only had "coke" (cocaine). The packet of cocaine was taken by Betty Guy from under the pillow of her bed. She asked the officer if he wanted to "shoot it" there. He noticed various narcotics paraphernalia in the bedroom at the time. A warrant for the sale of cocaine was issued, and on December 5, 1970, police officers armed with the warrant broke down the door of the apartment and made the arrest. The defendant was clothed only in a nightgown and pantyhose at the time of the arrest at approximately noon on December 5th. She was immediately taken to the bathroom, where she was ordered to strip, bend over, and spread her buttocks. Although a policewoman attempted to peer into her vagina, the bathroom was small, the lighting poor, and, since the defendant was seven months pregnant, she was unable to bend over very far. When she was taken to the Safety Building, another examination was made. One police-

woman held a flashlight while the defendant leaned on a chair and the other policewoman, wearing rubber gloves, spread the defendant's buttocks. It was at this time that a plastic bag, later determined to contain heroin, was found in the defendant's vagina.

The defendant was charged with the possession of heroin and prior to a trial to the court, a motion was brought to suppress the evidence obtained in the course of the search. The trial judge, as stated above, immediately refused to accede to the prosecutor's contention that a body-cavity search could be justified as a routine search incident to arrest or as part of a custodial search upon incarceration. He insisted that probable cause be shown and, on the evidence before him, made the finding that probable cause existed for the search of Betty Guy's privates in the police station.

I disagree with his conclusion that probable cause was shown. The majority opinion and the trial judge underpin their finding of probable cause on the fact that Betty Guy had been known to be a heroin user and that there had been prior information that she had concealed narcotics in her vaginal opening. This evidence was introduced by the testimony of Officer Randa of the Milwaukee police department's vice squad. The trial judge characterized Randa's testimony as "weak," but nevertheless he based his findings and conclusion upon such testimony. In my opinion, the testimony was so weak that it could not constitutionally support the inferences necessary to make a finding of probable cause. Officer Randa stated that he had been told in *1965* or *1966* that Betty Guy had concealed heroin in her vagina. In response to questioning, he stated that he had known the informer for several years and that he considered him reliable. While this court has repeatedly said that the identity of an informer need not be revealed, there must be sufficient evidence to show why he was reliable and how he obtained the information upon which

the particular search was based. The trial judge made a specific finding that there was no evidence to show how the unnamed informer had obtained his information. On the face of the record, under the rule of *Spinelli* and *Aguilar*, a finding of probable cause constitutionally could not have been made. The rule was restated by this court in *State v. Paszek* (1971), 50 Wis. 2d 619, 627, 184 N. W. 2d 836:

". . . the officer must establish: (1) The underlying circumstances from which he concludes that the informant is reliable; and (2) that the underlying circumstances or manner in which the informant obtained his information is reliable."

The majority opinion rests on the officer's characterization of the informant as "reliable" and completely ignores the second criterion of the *Aguilar-Spinelli* test. The majority opinion bases the finding of probable cause on whether a reasonable police officer would believe, under the circumstances, that a certain fact or situation existed. This is exactly what is not reasonable and permissible where the information is based upon a tip from an informer, unless that information meets the *Aguilar* test. *Johnson v. United States* (1948), 333 U. S. 10, 14, 68 Sup. Ct. 367, 92 L. Ed. 436, and *Spinelli, supra,* page 415, point out that the tests to be applied to an informant's information are "designed to implement the long-standing principle that probable cause must be determined by a 'neutral and detached magistrate' and not by 'the officer engaged in the often competitive enterprise of ferreting out crime.' "

It appears from the record that the trial judge found specifically that there was no evidence to show how the informer obtained his information. Accordingly, the search must, as a matter of law, be suppressed. Moreover, it is apparent that the probative value of information, no matter how derived, was insufficient. Officer

Randa testified that he had been told by an informer approximately *five* years before that Betty Guy secreted heroin in her vagina. This is hardly the contemporaneity required for a probable-cause search. 4 Wharton, *Criminal Law and Procedure* (Anderson ed., 1957), p. 162, sec. 1542, citing *Sgro v. United States* (1932), 287 U. S. 206, 53 Sup. Ct. 138, 77 L. Ed. 260, 85 A. L. R. 108; *State v. Jaeger* (1928), 196 Wis. 99, 101, 219 N. W. 281.

Although the fact was true in 1965, its probative value to support a search in 1970 was zero.

It should also be pointed out that Officer Randa stated that Betty Guy had been searched, presumably in the same way, on several occasions between 1965 and 1970. His testimony is devoid of any showing that the defendant had on those occasions marsupially concealed evidence in her vagina. Certainly there is no evidence to show that this was her usual *modus operandi.*

The majority opinion correctly states that there was overwhelming independent evidence that Betty Guy was a drug user and a user of heroin. Reliance also is placed upon these facts to support a finding of probable cause. These facts do not serve to underpin the assumption that she concealed heroin in a body cavity. The majority can only support its position by assuming that all female drug users, to a reasonable probability, conceal drugs in their body orifices. I know of no facts that would justify a court to make that assumption as a matter of judicial notice.

The information which is relied upon here is of the type condemned in *Spinelli,* page 416: ". . . a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." Certainly, the information was not of the nature and quality that should have induced an experienced vice squad officer, as Randa clearly was, on his own initiative to authorize this kind of a search.

Such searches under ordinary circumstances, and under the facts here, should be authorized only by a magistrate who impartially and neutrally can appraise the information and make a judicial determination of probable cause. I would adhere to the admonitions of the American Law Institute, *A Model Code of Pre-Arraignment Procedure* (Proposed Official Draft No. 1), April 10, 1972. Therein, in discussing body cavity searches, the commentary to the code, page 186, states:

"Searches of the type described in this Subsection are so personally intrusive and uncomfortable that ordinarily they should not be permitted on the decision of the officer alone. Unlike the ordinary application for a search warrant, in which the magistrate is seldom in a position to question effectively the police showing, an application for a warrant for a special search of the body's interior presents issues of necessity and propriety on which the magistrate's review of police judgment may be worthwhile."

In the instant case there was ample opportunity for the interposition of a magistrate's determination of probable cause prior to the police search. Betty Guy was in custody during the daylight hours of December 5th for almost an hour before the search at the police station was made. The police officer may well have suspected that drugs might be concealed in the prisoner's body orifices, but there was ample time to secure a judicial determination of the necessity and propriety of the search. If the same police energy had been used to keep Betty Guy under surveillance as was used to make the examination, the chances that she could have disposed of the evidence while a search warrant was sought would be minimal. The search here without a warrant cannot be defended on the basis that an immediate search was necessary to preserve the evidence.

A search must be justified on the basis of information in the hands of the police or in the hands of a magistrate

prior to the time the search is made. It cannot be justified *post hoc* because the search in fact revealed what was suspected. While the majority opinion is commendable in that it makes clear that a search of this type can be made only upon probable cause and effectively shuts off the practice of making these searches a routine for all female prisoners, it is deplorable to the extent that it *ex post facto* justifies the search because the evidence has in fact been produced.

There is always the danger of the destruction of evidence. That danger in the instant case, though minimal, existed. The United States Supreme Court addressed itself to that argument in *Schmerber v. California* (1966), 384 U. S. 757, 769, 770, 86 Sup. Ct. 1826, 16 L. Ed. 2d 908, when it stated:

"Whatever the validity of these considerations in general, they have little applicability with respect to searches involving intrusions beyond the body's surface. The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search."

While *Schmerber* permitted the taking of a blood sample as an incident to the arrest, that court pointed out that probable cause, *i.e.*, the defendant's intoxicated appearance, was apparent and furnished a "clear indication" that the taking of a blood sample would probably reveal a high blood alcohol content. The supreme court was careful to point out that the *Schmerber* opinion extended only to the blood-test situation. It cautioned against other types of body searches and emphasized that the blood sample was taken by a physician in a hospital environment according to accepted medical practice:

"We are thus not presented with the serious questions which would arise if a search involving use of a medical technique, *even of the most rudimentary sort,* were made by other than medical personnel or in other than a medical environment—for example, if it were administered by police in the privacy of the stationhouse." *Schmerber, supra,* pages 771, 772. (Emphasis supplied.)

While we need not reach the point in the instant case, because probable cause for the search does not exist, the vaginal examination of a woman seven months pregnant by nonmedical personnel would appear to be of dubious propriety. Propriety, however, and the dignity of man were apparently farthest from the considerations of the assistant district attorney who defended this police conduct on the trial level. When the trial judge raised the question of the violation of human dignity, the assistant district attorney responded, referring to the fact that Betty Guy was not fully clothed when she was taken into custody at noon on December 5, 1970:

"Now, if she had enough stamina or guts or heart or lack of moral conscience to stand on the front porch during the noon hour in a nightgown and panties, I don't think there is any greater violation of her right to decency to be disrobed in a bathroom of those things in front of two women, two police officers . . . ."

It is deplorable when public authorities attempt to tailor their standard of conduct to that of those they prosecute as criminals. Whatever may be a defendant's moral standards, it is to be hoped that the standards of the police and prosecution are higher than those whom they seek to apprehend as disrupters of public order and violators of decency. Mr. Justice BRENNAN, speaking for the majority in *Schmerber,* page 772, aptly stated:

"The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body *under stringently limited condi-*

*tions* in no way indicates that it permits more substantial intrusions, or intrusions under other conditions." (Emphasis supplied.)

I would hold that the search herein was without probable cause and the fruits of that search should be suppressed. I would also conclude that searches of this nature, except under circumstances far more exigent than presented here, should be conducted only after probable cause has been determined by a neutral magistrate.

I am authorized to state that Mr. Justice WILKIE joins in this dissent.