Robert **SALINAS, et al.,**
**Plaintiffs-Appellees,**

v.

**Chief Harold BREIER,**
**Defendant-Appellant.**

No. 81–2349.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 18, 1982.

Decided Dec. 22, 1982.

Rehearing and Rehearing En Banc
Denied Feb. 11, 1983.

Grant F. Langley, Asst. City Atty., City of Milwaukee, Milwaukee, Wis., for defendant-appellant.

Curry First, Perry, First, ·Reiher, Lerner & Quindel, Milwaukee, Wis., for plaintiffs-appellees.

Before CUMMINGS, Chief Judge, BAUER, Circuit Judge, and DOYLE,* Senior District Judge.

JAMES E. DOYLE, Senior District Judge.

This is an appeal by defendant chief of the Milwaukee Police Department (the Department) from a judgment for money damages following a trial to the court without a jury. Jurisdiction is present under 28 U.S.C. § 1343(3) in this action based upon 42 U.S.C. § 1983 in which it is alleged that appellant is responsible for unconstitutional searches of the bodies of plaintiff Carolyn Salinas and four of her children. The question on appeal is whether the evidence is sufficient to support findings of fact on the basis of which it can be concluded that the appellant chief may be held liable in money damages for the acts of the unidentified persons who ordered and conducted the searches.

The district court findings required by Rule 52(a), Fed.R.Civ.P., are embodied in its opinion. 517 F.Supp. 1272. Because the findings are not gathered in a single portion of the opinion, because it is unclear whether

certain findings are implied, because the validity of some findings is sharply challenged, and because a well-defined body of valid findings is crucial to the isolation and identification of the legal theory or theories upon which the judgment was entered or could now be affirmed, we set forth the district court findings with considerable care.

### I. District Court Findings of Fact

On January 24, 1974, Robert Salinas, Sr., and Carolyn Salinas and four of their children were returning by auto to Milwaukee from a trip to Texas. As their car stopped at a red light in Milwaukee, it was surrounded by Milwaukee police officers and agents from the Federal Drug Enforcement Administration. The officers had a federal bench warrant for the arrest of Robert, Sr. They were also acting on a tip that he was transporting heroin to Wisconsin from Texas. Some officers had their guns drawn; one put a gun to the head of Robert, Sr.

Robert, Sr., was transported to the Police Administration Building in downtown Milwaukee, and a decision was made to take Carolyn and the children downtown as well. The police held them at the scene of the stop until two police matrons, Audrey Reiter and Janet Boyle, arrived, at which time all were taken to a large room with smaller interrogation rooms adjoining it in the Police Administration Building. This was the Vice· Squad Assembly Room.

While they were in the Assembly Room, patdown searches of the Salinas family occurred. At some point Carolyn's purse was searched. Carolyn was taken into one of the interrogation rooms where a female police officer told her she was going to be searched. One by one, Carolyn's items of clothing were removed, and her arms, fingers, armpits, and back were searched for needlemarks. Then Carolyn was told to bend over. She then felt pokings in the rectal area and then the vaginal area.[1]

---

\* James E. Doyle, United States Senior District Judge for the Western District of Wisconsin, is sitting by designation.

1. There is nothing in the record to support a finding as to the identity of any police officer or matron or other person who searched the body of any of the plaintiffs, and no such finding was made by the district court.

When Carolyn was allowed to dress and return to her children in the Assembly Room, her 9-year-old son Robert was taken into an interrogation room. Robert was told to take off his clothes. A male police officer told him to bend over, and a finger probe search of his body began. When he returned to the Assembly Room he was alternately giggling and crying.

Melody then 8 years old, a daughter of Robert, Sr., and Carolyn, was also taken into a room where a female police officer searched her. She was told to remove her clothing. Then the officer started feeling in Melody and poking and stuff. Melody started to pull away and started to cry and then the officer let Melody go. The officer said, okay, put your clothes back on.[2]

Three year-old Rodney and Russell, who was just a baby, are sons of Robert, Sr., and Carolyn. They were also taken into interrogation rooms. When Rodney returned, his clothing was not buttoned correctly, and when Russell was returned to his mother, his paper diaper was on backwards.

After the searches, the family was taken to the police garage where their car was parked. They were not allowed to drive the car home as the police apparently wanted it detained. A ride home in a police squad was arranged.

The Department has no official arrest record for Carolyn Salinas or any of the children. Carolyn and the children were not free to leave at any time. They were in custody.

The searches here took place about four years after a similar search occurred in *United States ex rel. Guy v. McCauley,* 385 F.Supp. 193 (E.D.Wis.1974). In *Guy,* the plaintiff was arrested on a warrant in her home on December 5, 1970. While making the arrest, police officers observed drug paraphernalia on a bedstand. The arresting officer told two women police officers, including a woman named Alice Atkinson, to search Guy. He gave no instructions but

said that he assumed the women knew how to search her. Guy was taken to her bathroom where she was told to strip, to bend over, and to spread her buttocks. The policewomen examined her thoroughly, but there was no touching of her body. A decision was made to take Guy to Headquarters and search her again in the Vice Squad. She was again stripped and one of the female police officers, using rubber gloves, assisted her in spreading her buttocks. Eventually the female police officer saw a plastic container protruding from her vagina. Guy removed it. The policewomen, according to the decision, never placed either fingers or hand in the orifices of Guy's body.

Because Carolyn Salinas was the wife, and Robert, Melody, Rodney and Russell were the children, of a suspected drug dealer, they were subjected to degrading and humiliating searches. The searches were far more thorough than could be justified by any conceivable safety precautions. The police were unquestionably looking for drugs. The Salinas family was safely in police custody, but no attempt was made to obtain a search warrant.

At the time the Salinas family was searched, the Department had no rules or regulations in effect governing strip or body cavity searches. There was no rule which stated that an officer could not touch the buttocks of a person being searched. There was no broad, specific rule dealing with the search of prisoners. There was no rule or guideline as to what a male officer should tell a female officer when he requests her to search a female prisoner.

A document entitled "Milwaukee Police Academy, Search and Seizure" and used in recruit training programs constituted the most comprehensive statement of Department policy on the searches of the bodies of persons in custody. It stated:

Sometimes complete disrobing of a person may be required and sometimes search of

---

**2.** At certain points in his opinion, the district judge quoted or paraphrased testimony and then either stated or implied that he accepted it as true. At certain points in this recapitulation of his findings, therefore, we include as findings of fact the content of such testimony as quoted or paraphrased by the district judge.

body cavities may also be required, but that such detailed searches should be made only in extraordinary cases. Probable cause to believe something is hidden must be present. Search of body cavities should be by a doctor and under sanitary conditions. Only such force as is necessary should be used. That except in emergencies, obtain a search warrant first.

At trial much confusion existed even among highranking officers as to the definitions of "strip search" and "body cavity search." An Inspector Ziolkowski was unable to testify clearly whether a strip search becomes a body cavity search at the point at which an officer spreads the buttocks of an arrested person.

The custom of the Department was to have two female police officers or matrons take a female into an interrogation room, and to have one person observe the subject while she disrobes and gives her clothes to the other, who goes through the pockets, the linings. This is what a certain female police officer, Audrey Reiter, was trained to do. Since 1969 officer Reiter had observed another female officer, Alice Atkinson Swessel, doing this. In a Wisconsin state court criminal prosecution of a Betty Jean Guy, a suppression hearing was held in the course of which officer Swessel testified as follows concerning a search which she had conducted in 1970:

Q. Now why did you search her privates?

A. It's a routine search of female prisoners.

Q. You search all the privates of all female prisoners?

A. Yes I do.

In a decision in 1974 granting a writ of habeas corpus to Betty Jean Guy, a federal district court stated that the record in the habeas proceeding indicated that it is a common and routine practice in the City of Milwaukee to search the body cavities of females.

The searches in this *Salinas* case were not the clandestine act of a few policemen. They were done in the open by officers who believed their actions to be permissible. None of the officers present thought that the searches went too far. That practice was sanctioned by the policy, or more accurately, the nonpolicy of the Department.

The policy and custom of the Department could reasonably be interpreted by a police officer to allow the kind of tragic searches that occurred here. This is a situation in which there were no clear rules or regulations to guide the officers. Even the document entitled "Milwaukee Police Academy, Search and Seizure" is too vague to offer guidance.

The "policy" of the Department allowed an unconstitutional custom or practice to exist in the Department. Chief Breier, as the head of the Department, is responsible for that custom. His officers on the line get the message that they are not violating any policy of the Department when they conduct searches such as those described here.

Carolyn was conscious of the humiliation and should recover $10,000. Melody, Robert, Rodney and Russell were less aware of what was happening, and reasonable compensation to them would be $2,000 each for Melody and Robert, and $1,000 each for Rodney and Russell.

II. *Summary of District Court Findings*

The following summary of the essential findings made by the district court includes as explicit findings certain findings which seem implicit in its opinion:

1. Carolyn Salinas and each of the four children were taken into custody on January 24, 1974 under the circumstances described and were held in custody for a time at the police building. The persons who made the arrests, transported the plaintiffs to the police building, and held them there are known, but they are not named as defendants.

2. Because it was believed that Robert Salinas, Sr., might have arranged for a controlled substance to be hidden on or in the body of his wife or one of the children, Carolyn and each of the children were openly, not clandestinely, subjected to warrant-

less body searches while in custody at the police building. Carolyn, Robert, Jr., and Melody were each subjected to a search in which he or she was compelled to remove all clothing; the clothing was searched; the exterior of the naked body was observed; he or she was compelled to bend forward deeply at the waist; the searcher spread the cheeks of the buttocks with the searcher's hands; the searcher probed the rectum and, as to Carolyn and Melody, the vagina with the searcher's finger. Rodney and Russell were each subjected to a search in which his clothing was removed and examined, and the exterior of his body was observed. Each search was degrading and humiliating and far more thorough than could be justified by any conceivable safety precaution. The identity of the persons who ordered and conducted the searches is unknown; they were employees of the Department.

3. As of January 24, 1974 the Milwaukee Police Academy Search and Seizure Manual constituted the most comprehensive statement of Department policy on searches of the bodies of persons in custody. It was so vague that it could be understood to allow police officers to conduct illegal searches, and specifically could be interpreted to allow the kind of searches made of the Salinas family if the searchers believe something is hidden. The vagueness of the policy allowed an unconstitutional custom or practice to develop within the Department. Such an unconstitutional custom or practice had in fact developed as early as 1970 and continued as of January 24, 1974. The ingredients of that custom or practice included compelling persons in custody to disrobe, examining the clothing, observing the exteriors of the naked bodies, compelling the persons to bend forward deeply at the waist, spreading the cheeks of the buttocks with the searchers' hands, and inserting the fingers of the searchers into the rectums and, in the case of females, into the vaginas. The searches of the Salinas family were thought by the searchers to be, and the searches were, consistent with Department policy and with the custom or practice which had developed within the context of that policy.

4. As chief, defendant was responsible for the promulgation of a policy which made possible the development of a custom or practice of conducting body searches in the circumstances and in the manner in which the Salinas searches were conducted, and he was responsible for the fact that such a custom or practice had in fact developed during several years prior to January 24, 1974. As of January 24, 1974, defendant had knowledge that such a custom or practice existed. He gave a message to members of the Department that they were authorized to conduct body searches in the circumstances and in the manner in which the Salinas searches were conducted.

### III. Comments on District Court Findings

■ The district court findings may not be set aside unless clearly erroneous. Rule 52(a), Fed.R.Civ.P.

Those findings relating to what happened to Carolyn Salinas and the four children on January 24, 1974, are supported by testimony which the district court was free to accept, of course, and they are not clearly erroneous. We had difficulty, however, with several of those findings which bear on the possible legal responsibility of the defendant chief for what happened to these plaintiffs.

### A. The Guy Case

The district court recites a series of factual propositions concerning the experience of a woman named Betty Jean Guy on December 5, 1970. Apparently, these represent a summary by Judge Evans in this *Salinas* case of findings by District Judge John W. Reynolds on December 9, 1974, in a case in which the United States District Court for the Eastern District of Wisconsin granted a writ of habeas corpus to Guy, on the ground that her earlier conviction in a state court had been obtained by the use of evidence obtained in an unconstitutional search of her vagina by members of the Milwaukee Police Department. *United States ex rel. Guy v. McCauley,* 385 F.Supp. 193 (E.D. Wis., 1974). These factual propositions include the names of the two female officers

who had conducted the search of Guy, one of whom was an officer Atkinson. Also, in the course of its fact-finding in this *Salinas* case, the district court quotes from the *Guy* opinion testimony by officer Atkinson given in the course of her appearance (in 1971) in the state court of Wisconsin in the criminal prosecution which resulted in the conviction of Guy. *State v. Guy*, 55 Wis.2d 83, 197 N.W.2d 774 (1972). This testimony was to the effect that as of December 5, 1970, officer Atkinson "search[ed] all the privates of all female prisoners." Finally in this connection, the district court in *Salinas* observes that in the 1974 decision in *Guy* Judge Reynolds had stated that the record in the *Guy* habeas corpus proceeding indicated "that it is a common and routine practice in the City of Milwaukee to search the body cavities of females."

The district court in *Salinas* does not explicitly find as fact any of the factual propositions which it summarized from Judge Reynolds' opinion in the *Guy* case. It does not explicitly find as fact that as of December 5, 1970, officer Atkinson searched all the privates of all female prisoners. It does not explicitly find as fact that as of 1970–1971, it was a common and routine practice in the City of Milwaukee to search the body cavities of females. But a reading of the district court's opinion leaves us certain that the court intends all these propositions as explicit findings in *Salinas* under Rule 52(a).

We take pains to examine how this evidentiary question was dealt with in the *Salinas* trial.

When plaintiffs offered Judge Reynolds' *Guy* decision in evidence at the close of the first day of the *Salinas* trial, the explanation for the offer was that it had been referred to frequently in the course of pretrial depositions in *Salinas* and that, by stipulation, those depositions were being received in evidence as if the deponents had testified at trial. Specifically, plaintiffs' counsel observed that in taking the deposition of officer Atkinson in *Salinas*, he had referred to portions of her testimony in *Guy* and that she had said her testimony would

be the same as of the time of her *Salinas* deposition. Counsel for the defendant objected to the offer "as an evidentiary piece of material," while acknowledging that Judge Reynolds' decision in *Guy* could be relied on by counsel in argument and by the court in its decision. Counsel referred specifically to a footnote in Judge Reynolds' *Guy* decision (385 F.Supp. at 199, n. 6), which quoted testimony by a certain officer Randa given in the state court prosecution in *Guy*. Counsel observed that while in *Salinas* the court could rely on that footnote in analyzing the *Guy* decision, the testimony Randa had given in the *Guy* prosecution is not appropriate testimony in the present case.

Counsel for plaintiffs then repeated that there were frequent references to Judge Reynolds' *Guy* decision in the course of the depositions and in certain exhibits in *Salinas,* such as a police training manual. He argued that *Guy* is a sound statement of what the law should be, tying in to plaintiffs' argument that the law was never followed in the Department.

Judge Evans' response was that Judge Reynolds' decision might have some relevancy on issues like notice, state of mind, intent and those sorts of things. He stated that he would receive the decision as an exhibit "for what it is worth and see if it has any value on any of those issues. Absent that, I don't see that it would have any evidentiary value in this case. But—." Counsel for the defendant pressed:

> Mr. Langley: Your Honor, I guess you've answered my question. My only problem would be that I don't have to respond to all that factual information—.
> The Court: No.
> Mr. Langley: That's my concern.
> The Court: No you don't.

At the very opening of the second day of the *Salinas* trial, counsel for defendants stated that he wished to make a record of an off-the-record discussion which had occurred prior to the commencement of trial on the first day. He stated that he had indicated to the court that he objected to any evidence regarding matters which oc-

curred after January 24, 1974, the date of the Salinas incident. He said that he had made specific reference to Judge Reynolds' decision in *Guy* and any testimony relating to that decision. He said that Judge Evans had overruled his objection, indicating that Judge Evans would let that type of material into the record, and then it would be a question of what weight it would be given after the trial was completed. Following this summary of the off-the-record discussion, Judge Evans replied, "That's correct."

■ It would have been error to receive in evidence in *Salinas* any testimony given in the state court prosecution of *Guy,* and any findings of fact made by Judge Reynolds concerning a search of Guy's body and concerning the practices of the Milwaukee Police Department as of any period of time, for the truth of that testimony and those findings. Defendant Breier was a party neither to the state criminal prosecution of Guy nor to her habeas corpus proceeding in the United States District Court for the Eastern District of Wisconsin. Judge Evans perceived that this would be error. He declined to receive Judge Reynolds' *Guy* opinion in evidence for the truth of any testimony quoted or summarized within it or for the truth of any of Judge Reynolds' own findings about the Guy incident itself or about Milwaukee police practices in general. The *Guy* opinion was received only for whatever relevance it might prove to have concerning notice, state of mind, intent "and those sorts of things." It was error, then, in the course of fact-finding in *Salinas* for the district court to accept as true, as it plainly did, testimony from the record in *Guy* and facts as found by the court in *Guy.*

B. *Existence or Non-existence of a Policy*

■ The district court opinion is ambiguous whether there was a policy in effect as of January 24, 1974 on the subject of strip and body cavity searches. It conceded that the Academy Manual was "the most comprehensive statement of department policy" adverted to in the testimony. The Manual plainly embodies a policy governing strip and body searches of persons in custody:

J. Depending upon the nature of the crime, a more detailed search than is normally made may be reasonable and necessary.

1. Sometimes complete disrobing of the person may be required.

2. Sometimes search of body cavities may also be required.

3. Such detailed searches should be made only in extraordinary cases

a. Probable cause to believe something is hidden must be present

b. Search of body cavities should be by a doctor and under sanitary conditions

c. Only such force as is necessary should be used

d. Except in emergencies obtain a search warrant first

It is uncontradicted that the Manual had been published and used in training recruits since 1971. We appreciate that questions may exist whether the policy was sufficiently precise to be understood, but a policy had surely been promulgated. Any implied finding by the district court that *no* policy had been promulgated as of January 24, 1974 is clearly erroneous.

C. *Openness of Salinas Searches*

■ The district court found that the searches of Carolyn Salinas and the four children were not the clandestine act of a few policemen, but were done in the open by officers who believed that their actions were permissible and not going too far. These findings are clearly erroneous. The evidence is that the search of Carolyn was conducted by one female; another female led all four children into an interrogation room, one by one, and searched Melody; Robert, Jr., Rodney and Russell were searched by two males. None of these four searchers was identified. Because the searches were conducted behind closed doors, no one else observed them. Therefore, there is no evidence of a belief of any identifiable employee of the Department whether the searches were conducted in a permissible manner or went too far.

### D. Custom or Practice [3]

1. *Arrest and custody.* There is no evidence of a custom or practice: of taking into custody a wife and children found within an automobile in which is also found a husband and father who is arrested on warrant and who is suspected of using that automobile to smuggle controlled substances; of taking wives and children into custody in any comparable circumstances; or of searching the bodies of wives and children in any comparable circumstances.

2. *Children.* There is no evidence of a custom or practice of searching the bodies of children in any circumstances.

3. *Women.* There is no evidence of a custom or practice of use of the fingers of a searcher to probe the rectum or vagina.

■ With respect to a custom or practice of using the hands of a searcher to spread the cheeks of the buttocks of the person being searched, the evidence consists exclusively of the testimony of female police officers Atkinson, Reiter and Boyle:

Officer Atkinson [4] testified that: During the period from about 1970 through January 24, 1974, her practice was to search the general area of the vagina and rectum in cases in which an informant has stated that this is where the female being searched is known to carry drugs, and possibly in drug cases in which there is no such statement by an informant. Officer Atkinson used her own judgment in deciding whether to conduct such a search. It was not her practice to probe the body. She did not routinely conduct a strip search of every female prisoner she came in contact with. She never probed body cavities. The closest she would come was to touch the buttocks muscles. It was not her practice to search all the private parts of all female prisoners, or of all female prisoners who are charged with or have been arrested for a drug-related crime. When it was determined to search the private parts of a female prisoner, it was not her practice first to obtain the services of a nurse or a medical doctor, and she had never conducted such a search in a hospital setting. In searching the private parts of females, she used rubber gloves. She obtained them from County General Hospital and kept them in a box in a drawer of a desk in the police building. Because she would be touching the person being searched and the clothing of that person, she used the rubber gloves for her protection and the protection of the person being searched. If a police officer told officer Atkinson that an arrested female was believed possibly to be carrying drugs on her body, and asked officer Atkinson to search that prisoner's body, officer Atkinson would do so, and the search would very possibly include the vaginal area. It is possible that she had conducted a search of the private parts of a female under the age of 18. It is very possible that she had searched the private parts of females in cases that were not strictly drug related, searching for contraband or weapons. She had never seen any police woman she worked with probe body cavities.

Officer Audrey Reiter testified that: She had been a policewoman in the Department from about 1969 to the time of her deposition, February 2, 1978. When asked by a police officer to search a female whom the police officer believed might have controlled substances on her person, officer Reiter would conduct the search by asking the prisoner to remove her clothing, searching the clothing, observing her body, and if there was a possibility of something being concealed in her vagina, asking her to bend over and to spread her cheeks with her hand,

---

3. This comment reflects our opinion, expressed above, that the content of Judge Reynolds' decision in *Guy* was not received, and could not properly have been received, in *Salinas* as evidence of what actually occurred in the *Guy* search or what Milwaukee police routines were at any time.

4. By the time she testified in *Salinas* by deposition and at trial (February 10, 1981), Atkinson, who was identified in the *Guy* case as one of the searching officers, had married and taken the name Swessel. I will refer to her as Atkinson.

so officer Reiter could observe the cavities. She had never observed a search of a female prisoner in which there had been a probing of the body cavities. She had observed officer Atkinson spreading the cheeks of females, about half a dozen times, and also at times saw officer Atkinson have the searched person spread her cheeks herself. Officer Reiter decided that she would not use her hands to spread the cheeks of the buttocks of the persons searched.

Officer Janet Boyle testified that: She had been a policewoman in the Department from about 1968 to February 2, 1978. As of about January 24, 1974, whenever a fellow police officer told her that he had probable cause to believe that an arrested person had a controlled substance on her person and asked for a search, officer Boyle's practice was to ask the person to strip, search her clothing, and sometimes ask the searched person to bend over and to separate the cheeks of her buttocks, so that officer Boyle could visually examine that part of the body. Officer Boyle had never known of anybody that conducts cavity searches. She had heard about the *Guy* case and she was aware that officer Atkinson had conducted body cavity searches.

The district court was free to find, as it did, that for several years prior to January 24, 1974 and as of January 24, 1974, it was a custom and practice within the Department to conduct bodily searches of some arrested women and, particularly in cases involving possession of controlled substances, to require such females to remove their clothing, to bend over, and themselves to spread the cheeks of their buttocks to permit visual observation of the rectal and vaginal area by the searcher. The district court was free to find, also, that it was the custom and practice of one police officer, Alice Atkinson, to use her own gloved hands to spread the cheeks of the buttocks of searched females to permit visual observation of the rectal and vaginal area.

It was clearly erroneous for the district court to find, as it did, that it was a custom or practice of two or more members of the Department to touch the buttocks of searched persons or to use their fingers to probe the rectums or vaginas of searched persons.

### E. Defendant's Knowledge and Intent

*Knowledge.* The record permits a finding that as of January 24, 1974, defendant knew that the Academy Manual on bodily searches had been published in about 1970, with whatever degree of specificity or vagueness marked its language, and that the policy defined in the Manual was being implemented. The record does not permit a finding that he knew that women and children were being taken into custody in the circumstances of the *Salinas* case and then searched in any manner, or that he knew that in bodily searches of persons lawfully in custody, Department personnel were using their fingers to probe rectums and vaginas. It does not permit a finding that he knew that officer Atkinson was using her hands to spread the cheeks of the buttocks in searching lawfully arrested persons. Whatever significance may attach to Judge Reynolds' decision of December 9, 1974, in *Guy,* in terms of defendant's knowledge and state of mind, that decision was not entered until more than ten months after the *Salinas* searches. There is no evidence that prior to January 24, 1974 the defendant had knowledge even of the allegations made by Guy concerning the 1970 search of her body.

*Intent.* There is no evidence beyond the language itself that the defendant intended the guidelines in the Academy Manual to be vague. There is no evidence that he intended to promote a custom or practice of conducting body searches in the circumstances and in the manner in which the *Salinas* searches were conducted. There is no evidence that he intended to send a message, in any manner, to the Department's officers that they were authorized to conduct bodily searches in the manner in which the *Salinas* searches were conducted. The district court noted specially the following response by defendant as a witness at trial:

Q. . . . Do you feel, therefore, responsible for the lack of general good conduct

because of the testimony that a person under your control did not follow the rules of your department? . . .

A. No, sir, I don't feel that I'm responsible. I was not there. I gave no direction. It wasn't according to the rules of the department or the policies of the department; therefore, I don't feel that I'm responsible for that particular conduct.

The court's observation was that this denial of responsibility only emphasized that the officers of the line get the message that a Salinas-type search is acceptable. Of course, if the defendant had in fact covertly conveyed such a message, and if Department personnel knew he had done so, his subsequent denial of responsibility might well signal that the covert message remained in force. But the denial of responsibility is not independently probative that the proposition denied is true.

## IV. *This Court's Legal Conclusions*

It might have been possible to view this as a case in which the plaintiffs assert that they were unlawfully arrested at the place where the automobile was stopped, unlawfully transported to the police building, and unlawfully confined for a time at the police building. The complaint includes mention of illegal and improper imprisonment and an absence of arrest. In such a context, the specific manner in which the body searches were conducted might have been viewed as aggravations of the unlawful arrest and imprisonment.

However, the district court noted that plaintiffs "are not alleging that the arrest was illegal," but rather that the body searches were illegal. The district court commented (517 F.Supp. at 1275):

[A]lthough there is no question that the arrest of Robert Salinas was valid, the "arrest" of his wife Carolyn and the children is at the very least questionable. Even assuming the legality of the decision to take Carolyn Salinas and the children into custody, the search cannot be justified. In fact, the searches under consideration here shock my conscience. Because Carolyn was the wife, and Robert, Melody, Rodney and Russell were the children of a suspected drug dealer, they were subjected to degrading and humiliating searches. The searches were far more thorough than could be justified by any conceivable safety precautions. The police were unquestionably looking for drugs.

The district court's assumption that the warrantless arrest and confinement of Carolyn and the children were lawful is an extremely important assumption. First, it is well established that there is considerably greater constitutional power in the police to search the bodies of persons in custody than the bodies of persons not in custody. *See generally* 2 LaFave, *Search and Seizure* §§ 5.2, 5.3 (1978 & Supp.1982). Second, in the circumstances here, the only realistic explanation for the legality of the arrests and confinement, if they were legal, is that there was probable cause to believe that Carolyn and each of the children was in possession of a controlled substance. When a person is lawfully arrested for this reason, of course, post-arrest searches of the body to discover the controlled substances are generally permissible. *Id.* We share in the district court's comment that the arrests and confinement were at the very least questionable.[5] However, it is not the defendant who personally arrested Carolyn or any of the four children and it is not he who then confined them. Plaintiffs made no effort in these respects to prove any of the facts necessary to establish liability on the

---

**5.** None of the witnesses involved in the arrest and confinement admitted that there had been an arrest or involuntary confinement. Because the automobile was to be searched and the weather was cold, they transported Carolyn and the children to the police building and then to their home as a courtesy, they testified. The rejection of that account by the district court has resulted in an absence of any explanation or attempted justification of an arrest and confinement.

part of the defendant for the acts of others: e.g., the promulgation of a policy on arrests under similar circumstances; the existence of a custom or practice on that subject; or failure to train in the performance of that function. In the absence of any such evidence, but in the presence of an effort to impose personal liability upon the defendant chief for the manner of the search, it is necessary to evaluate the constitutionality of that search as if it had been preceded by valid arrest and as if the confinement was lawful. Therefore, however anomalous it may appear that baby Russell, for example, was lawfully arrested and confined, it is necessary for us, as it was for the district court, to assume that the arrests and the confinement of Carolyn and each of the four children were lawful.

With respect to the body searches, the effect of our rulings setting aside certain findings of fact by the district court is to eliminate consideration of any specific, identifiable instance—such, perhaps, as may have occurred in the search of Betty Jean Guy in 1970—in which Department employees conducted a body search. The effect is also to eliminate consideration of any earlier searches of children. Even the asserted vagueness of the policy embodied in the Academy Manual cannot be thought to have caused the development of a custom or practice in the absence of evidence that such a custom or practice did in fact develop. The effect of our rulings on the findings is to confine the generalized evidence of a custom and practice of two or more officers to the following elements: (1) requiring the person in custody to disrobe; (2) searching the clothing; (3) requiring the person to bend forward deeply at the waist; and (4) requiring the person to use his or her hands to spread the cheeks of the buttocks.

We turn, then, to the possible liability of the defendant chief for the acts of the unidentified Department employee who required Carolyn to remove her clothing, who examined the clothing, and who required Carolyn to bend forward deeply at the waist.[6] With the possible exception of part J(3)(b) and (d), relating to search by a doctor and to obtaining a search warrant, these acts on the part of the searcher were consistent with the Academy Manual. The nature of the crime was possession of a controlled substance. Probable cause existed, we are presuming, to believe that the controlled substance was on Carolyn's person. When the substance was not found at an early stage of the search, there was probable cause to believe that the substance was hidden on or within her body. When her clothing had been removed and searched without success and the substance was not observed on the exterior of her body, there was probable cause to believe it was hidden in a body cavity. No force was necessary to compel her to bend in such a way as to expose, in some degree, her rectum and vagina.

As plaintiffs argue and the district court found, the policy embodied in the Academy Manual is indeed ambiguous in several respects. It is not at all clear whether "first" in "obtain a search warrant first" means prior to requiring disrobing, or only prior to requiring the disrobed person to bend forward, or only prior to use of a searcher's hands to spread the buttocks, or only prior to the insertion of a finger or an instrument into the rectum or vagina. Similarly it is unclear whether the requirement to bend over and the visual examination at that stage can be performed only by a doctor. The more reasonable construction of the language ("search of body cavities should be by a doctor and under sanitary conditions") is that it applies only to the ultimate stage at which the searcher's hands are applied to the body.

In any event, we construe the policy statement strictly as against the defendant, whose responsibility it was to promulgate a clear statement. So construed, the policy statement permitted Department personnel

6. There is no evidence that Carolyn was required to spread the cheeks of her buttocks.

to consider themselves free, with probable cause to believe that a controlled substance is hidden in a person's rectum or vagina, without first obtaining a warrant and without obtaining the services of a doctor under sanitary conditions, to require the person, without the use of force, to bend forward deeply at the waist so as to expose her rectum and vagina to visual inspection. As the district court properly found, such a custom or practice had in fact developed within the Department and it was actually applied to plaintiff Carolyn Salinas.

■ The ultimate question is whether a body search limited to these steps is constitutionally permissible when the person searched is in custody following a lawful arrest and when there is probable cause to believe that a controlled substance is hidden on or within the person's body. We think the answer is clear. Such limited measures in these circumstances are valid under the fourth amendment as it is incorporated within the due process clause of the fourteenth amendment. Such a search is reasonable, in the constitutional sense, and performed in a reasonable manner. *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Gustafson v. Florida,* 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973); *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974). Although even these limited measures are indeed degrading and humiliating, as the district court found, they do not approach in severity those intrusions present, for example, in *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

The judgment of the district court is reversed and vacated. The cross-appeal of plaintiffs-appellees is dismissed.

CUMMINGS, Chief Judge, concurring.

I concur only on the assumption that there was probable cause or at least a reasonable suspicion to believe that the Salinas family was concealing contraband on their persons. *Bell v. Wolfish,* 441 U.S. 520, 563, 578, 595, 99 S.Ct. 1861, 1886, 1894, 1903, 60 L.Ed.2d 447 (concurring opinion of Justice Powell, dissenting opinions of Justices Marshall and Stevens, with Justice Brennan joining in Justice Stevens' dissent).[1] Since the trial judge assumed the legality of the arrests (517 F.Supp. at 1275), he must have assumed there was probable cause to believe the four arrestees possessed heroin,[2] as Judge Doyle points out (pp. 1083–1084, *supra*). Otherwise the search of the four would have constituted a constitutional tort compensable under 42 U.S.C. § 1983, as Judges Sprecher, Bauer and I held in *Doe v. Renfrow,* 631 F.2d 91, 92–93 (7th Cir.1980) (per curiam); certiorari denied, 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395; see also *Iskander v. Village of Forest Park,* 690 F.2d 126, 129–130 (7th Cir.1982); *Tikalsky v. City of Chicago,* 687 F.2d 175 and cases cited at 182 n. 12 (7th Cir.1982); *Tinetti v. Wiltke,* 479 F.Supp. 486 (E.D.Wis.1979), affirmed, 620 F.2d 160 (7th Cir.1980); *United States ex rel. Guy v. McCauley,* 385 F.Supp. 193 (E.D.Wis.1974); *Jane Does 1–5, etc. v. City of Chicago* (N.D.Ill. No. 79 C 789), mem. op. 10 (Jan. 12, 1982).

1. While the majority opinion in *Wolfish* upheld body cavity searches of detainees and prisoners without probable cause, the implication is that probable cause would be necessary in the case of mere arrestees. See 441 U.S. at 558–566, 99 S.Ct. at 1884–1888.

2. Robert Salinas, the *pater familias,* was the first to be arrested. This was done under a federal bench warrant because the arresting officers were "acting on a tip that he was transporting heroin to Wisconsin from Texas" in the auto occupied by him, his wife and four children. 517 F.Supp. at 1274.